GRAYSON, TRUSTEE *v.* BERRY ASPHALT COMPANY, INC.

4-9576                                    243 S. W. 2d 1

Opinion delivered October 29, 1951.

Rehearing denied November 26, 1951.

*Keith & Clegg,* for appellants.

*Gaughan, McClellan & Gaughan, Tompkins, McKenzie & McRae, Melvin Chambers* and *Mahony & Yocum,* for appellees.

GRIFFIN SMITH, Chief Justice. As owners of the mineral, royalty, and leasehold estates pertaining to part of a 40-acre tract on which there is a producing oil well, appellees contend that they are entitled to their respective shares to the exclusion of appellants who own the adjacent 22 acres. Each tract—appellees' interests in 17.85 acres, and the undrilled 22 acres constituting appellants' holdings—is in the southeast quarter of the northwest quarter of section 7, etc., in Ouachita county. Pipeline runs have been paid into the court's registry with a prayer through impleadment for distribution. The total of $62,415.68 is not questioned.

The well, known as Boyce No. 1, was drilled to a depth of approximately 4,000 feet in June, 1942, where the so-called "Smart sand" was encountered. It was abandoned in July because of non-production. No casing

was then set. In January, 1945, the well was extended to a depth of 4,020 feet. The Travis Peak sand found at 3,906 to 3,920 contained water only, but the same stratum at 3,764 to 3,769 yielded some production during January to March. Appellants say that the recovery during this period was 1,157 barrels against an allowable of 2,108 barrels.

The well was again plugged back, and, as appellants express it, *recompleted* March 26, 1945, in the James lime at 3,124-3,140 feet.

The well in question was placed 330-ft. north and 260-ft. east of the southeast corner of the tract that is treated as a quarter-quarter section.

September 26, 1941, the Oil and Gas Commission adopted field rules for the Travis Peak Pool in the Stephens field, limiting drilling to one well on any ten-acre lease or ten-acre subdivision of a lease. The rule applied specifically to "the same producing horizon." There was a further provision that in the event the drilling should be on a lease covering more than ten acres owned by one person or by persons in moiety, the additional area "in no event more than ten acres in excess of ten acres upon which such well is drilled, shall be assigned to that particular well." The right of integration was given where tracts were separately owned, but where the owners failed to effectuate such integration the Commission's duty incident to the prevention of waste and avoidance of unnecessary drilling contemplated affirmative action looking to the development of such lands as a drilling unit.

Appellants, who by the decree were denied the right of participation in production coming, *prima facie,* from the 17.85-acres, concede there is no formal Commission order as to wells drilled to the James lime pool, from which the production now comes. They rely primarily upon estoppel to give them participation in production to the extent of 22/40ths, contending that Crow's acts and record statements preclude him from denying that in equity unitization occurred when in renovating after

the first failure it became necessary to procure steel affected by government priorities (Petroleum Administrative Order No. 11), and that such casing would not be furnished where operations were on less than forty acres. The regulation covered the *use* of casing and extended to plugging back, deepening, reworking, and recompletion. It contemplated as a condition precedent to procurement of the steel that property interests in drilling units should be consolidated, otherwise the casing would not be supplied. Appellants point to the fact that in a Commission's "well-completion form" filed by Crow February 10, 1945, it was stated that 40 acres were in the drilling unit.

Facts essential to the litigation were stipulated. There is no proof that operations drained oil from the 22-acre tract, hence the controlling question is whether procurement of the casing at a time when the government's rules limited the supply to 40 acres had the effect of creating equities in appellants' favor entitling them to participation in production admittedly originating on appellees' property. *Yelvington* v. *Alston, Trustee,* 207 Ark. 266, 180 S. W. 2d 120, is cited by appellees as authority for the Chancellor's ruling, but as appellants point out, facts are different. In the Yelvington case there was testimony that both permits were issued on ten-acre tracts. In the case at bar the only rule promulgated by the Commission authorized drilling to the Travis Peak Pool on any ten-acre lease or ten-acre subdivision of a lease "to the same producing horizon." No complaint appears to have been made by the Commission that its overall purpose had been misunderstood, or that there was an intent to unitize.

In the absence of a showing that the well was drilled in circumstances objectionable to those interested in the 22-acre tract because the natural consequence of production would be to take oil from it, we are unable to see how appellants were injured by a trespass upon the Federal rule allocating casing. On the contrary it is just as reasonable to believe that at a time when the Commission was recognizing 10-acre drilling sites for the mentioned

structure appellants stood to profit by the development. If the area proved worthless the test cost them nothing; if successful to a point justifying operations on the 22-acre tract, they would be the beneficiaries of exploration.

Affirmed.