Charles D. LONG, (Plaintiff) Appellant,

v.

NORWOOD HILLS CORPORATION, (Defendant) Respondent.

No. 31435.

St. Louis Court of Appeals.

Missouri.

May 22, 1964.

Motion for Rehearing or to Transfer to Supreme Court Denied July 21, 1964.

Edward W. Fredrickson and John P. Montrey, St. Louis, for appellant.

Leritz & Leritz, J. D. Leritz, J. L. Leritz, St. Louis, for respondent.

Jesse E. Bishop and John B. Sharpe, St. Louis, amicus curiae.

RUDDY, Acting Presiding Judge.

In this case judgment was rendered in the trial court in favor of the defendant and plaintiff appealed to the Supreme Court of Missouri. That court transferred the case to this court on the ground that it lacked

jurisdiction of the appeal. See Mo., 360 S.W.2d 593.

As a prefatory statement of what this case is about, we adopt portions of the opinion of the Supreme Court of Missouri, with some changes, without the use of quotation marks.

Plaintiff, the owner of 10 shares of stock in Norwood Hills Corporation, defendant herein, brought this suit seeking to dissolve said corporation and to have the assets thereof sold by a receiver to be appointed by the court, and the proceeds distributed according to law. Defendant was incorporated Jan. 30, 1933, under the laws of Missouri relating to business companies. It was and is plaintiff's theory that from the beginning the officers and directors have operated a country club and have devoted the assets of the corporation to the enjoyment of its members, have made no conscientious effort to operate the business in a manner that would produce a profit for the corporation, and that defendant's management "have acted, are (is) acting and will continue to act illegally, oppressively and fraudulently * * * and the corporate assets are being misapplied or wasted * * *" and that such conduct is illegal and fraudulent to the interests of the stockholders. Plaintiff claims there is no intention or desire on the part of those in control of the management of said defendant corporation to earn sufficient money to pay a reasonable dividend to the stockholders or to ever pay a reasonable dividend to stockholders. He brought this action on his own behalf and on behalf of all other similarly situated owners of shares of stock of defendant corporation. It is alleged in the answer of defendant that since its incorporation the primary purpose was the operation of a private country club known as Norwood Hills Country Club, some of whose members are not stockholders of defendant corporation. It is further alleged in said answer that the purpose, scope, nature and manner of defendant's operation has been continuously the same up to the present time and that plaintiff had full knowledge of the scope, nature and purpose of defendant's operations and that these operations were approved and ratified by plaintiff and that plaintiff acquiesced in all of the operations performed on the part of the defendant and that by reason thereof plaintiff is estopped from prosecuting his cause of action.

It is further alleged in said answer that plaintiff by his failure to prosecute with diligence the claim he now alleges is guilty of neglect and laches and is now estopped from pursuing his alleged claim.

For all practical purposes defendant was a successor to North Hills Country Club which had become insolvent. Defendant was authorized by its charter, among other things, to purchase, hold, sell, and lease real estate and "to engage in the business of operating golf courses, club houses, swimming pools, and in any other enterprise intended for pecuniary profit or gain not otherwise herein especially provided for; and to do all things that may be properly done incidental to the foregoing purposes, and to have all the rights and privileges in the State of Missouri and in the United States and in foreign countries which accrue to manufacturing and business corporations under the laws of the State of Missouri." There were 82 original subscribers including plaintiff, each of whom paid $100 for one share of stock in the defendant corporation. The original by-laws provided that such stock could not be transferred on the books of the corporation until it had been offered for sale to the corporation for a period of 30 days at the price for which the stock was originally issued. Prior to the repeal of this by-law in 1949, a number of the shareholders had sold their stock to the corporation with the result that the number of shares was reduced to 66.

Shortly after incorporation defendant purchased the personal property of North Hills from its receiver and entered into a lease with the Brownstone Hills Realty

Company, of the real estate formerly occupied by North Hills, which lease contained an option to purchase said real estate. Since that time defendant has operated two golf courses, a club house, swimming pool, and other facilities incident to such operations. Defendant has always operated a private country club but for a number of years it permitted outsiders to play golf on one of the golf courses, known as the east course, upon payment of green fees.

In 1941 defendant exercised its option to purchase the 326 acres of land it had leased shortly after its incorporation. It has since sold approximately 15 acres but is still the owner of the remainder thereof.

The transcript of the oral testimony in this case is voluminous and the exhibits are numerous. We see no need to give a detailed account of the testimony given in this case and when the record is shorn of the numerous colloquies between counsel and between counsel and the court we think what is left is fairly summarized in the following statement of facts.

Prior to the incorporation of the defendant corporation the original subscribers to the capital stock of the defendant corporation were members of the North Hills Country Club that was operated on the real estate now owned by the defendant corporation. This club operated under a pro forma decree of incorporation and was a not for profit corporation. Plaintiff joined the North Hills Country Club in 1923. Prior to the organization of the defendant corporation the North Hills Country Club was in default on an agreement with the owners of the real estate. The North Hills Country Club was in serious financial difficulties and the membership of the club contributed sums of money to keep it going and plaintiff's contribution was between $1900 and $2500. The defendant corporation was organized to salvage the investment made by the members of the old corporation and as testified to by A. H. Stiehl, one of the Amicus Curiae, the

defendant corporation was organized for the preservation of the old North Hills Country Club and to retrieve some of money advanced to that club. He described the formation of the defendant corporation as a reorganization of the North Hills Country Club. Another beginning stockholder of defendant corporation said that it was organized for the purpose of starting a new golf club after the old one had failed. One of the witnesses said that the purpose to be served by the formation of the new corporation was to take over the assets of the old corporation. In describing the transition from the North Hills Country Club to the defendant corporation, he said that he was a member of North Hills from 1921 to 1933 "when it was reorganized."

Virtually all of the original incorporators who testified said that they were members of the North Hills Country Club and that defendant corporation was organized for the purpose of operating a country club which was to be known as the Norwood Hills Country Club. They said that the country club was never organized as a separate entity or group.

James E. Mahen was one of the original incorporators and in 1933 was the first general chairman of all committees of the new corporation. He testified that he had been a member of the old North Hills Country Club and that the new corporation was a continuation of that club. He further testified that he knew plaintiff and that plaintiff was a member of the Norwood Hills Country Club at the beginning. The minutes of the early meetings of the Board of Directors show the approval of applications for regular and for other membership in the Norwood Hills Country Club.

Plaintiff in describing the purpose of defendant corporation at the time of its organization said that the corporation was not a country club and he maintained that the country club was a separate entity, but added, that "at the beginning we had no

country club." He said that some in the new organization operated on the theory that the new corporation was trying to follow through on the original organization but plaintiff insisted that there was a separation between the corporation and the country club. He admitted that at the time of the organization of the defendant corporation he became a member of the country club. In certain interrogatories propounded to plaintiff, when asked the date defendant first operated the country club, he answered, "from the beginning." And when asked, has defendant operated the country club continuously since that date, he answered, "Yes."

All of the original stockholders were dues paying members of the Norwood Hills Country Club and had available for their use the facilities of the corporation, viz., the golf courses, clubhouse, lockers, pro shop, swimming pool and dining room.

Many of the officers who followed the first president, together with many others who served as members of the boards of directors, testified that during their tenure of service, which covered practically the entire life of the defendant corporation, the corporation did not operate any business other than the Norwood Hills Country Club and that the officers and boards of directors did not consider the operation of any other business. The record shows the first president operated similarly. All of the officers and directors who testified said that the primary function of the corporation has been the operation of a private country club and that there has been no change in the operation of the corporation since its beginning. All testified that the country club and the corporation have always been one and the same.

Plaintiff, while contending he knew of no such operation, admitted that he paid an annual fee for the privilege of playing golf. He described this fee as "a contribution to the corporation to keep the thing going." He admitted paying locker fees, attending social functions, using the dining room and patronizing the buffet.

From the very beginning of the corporation defendant has been a member of the St. Louis District Golf Association and its members have been delegates to that association and some have served as officers of the association. Through the years defendant has been host to a number of golf tournaments conducted under the auspices of the District, State, the Western Local, the N.G.A. and the P.G.A.

A perusal of the minutes of the stockholders' meetings and the directors' meetings held prior to 1958 and read in evidence indicate that all of the business planned and discussed at these meetings related to the operation of defendant as a private country club. Plaintiff attended many of the stockholders' meetings prior to 1958 either in person or by proxy.

James E. Mahen, a stockholder from the very beginning of the corporation, was general chairman of all committees in 1933 and said that in the year 1933 the corporation had a membership committee, greens committee, house committee, tournament committee, tennis committee and swimming committee. In the very beginning there were several classes of membership, namely, special members and social members. In turn, the special members seemed to be divided into two classes, one class eligible to play the east golf course and one class eligible to play the west golf course.

The 1952 By-Laws established ten different classes of membership which we need not itemize here.

The minutes of the board of directors' meetings held through the years indicate that applications for regular and other membership were read and approved at these meetings which included the meetings of the first year of the corporation's existence. These minutes show that these applications for membership in the country

club were accepted and approved from the very beginning of the corporation. The record shows 243 regular members joined since 1954.

Plaintiff resigned his membership in the country club in 1941. Ownership of a share of stock was not a condition requisite to membership in the Norwood Hills Country Club. Many of the members were not owners of shares of stock in the beginning years of the corporation. The membership has experienced a steady growth and today its members number approximately 800. The record indicates that there was no initiation fee in the beginning years, whereas, today the initiation fee for regular membership is $900. The payment of monthly dues has been a requisite of membership ever since the beginning and today regular (golf) members are required to pay $37.50 per month. The dues and initiation fees have been raised periodically throughout the years of the corporation's existence. Green fees have been charged for guests of the members and some of the members testified that when the dues were raised members resigned from the club.

The original by-laws adopted by the corporation contained the following provision ·

"31. No share of the capital stock of this Corporation shall be transferred on the books thereof, unless and until the same has been offered for sale to the Corporation for a period of thirty (30) days, at and for the price at which said stock was originally issued by the Corporation."

At a stockholders' meeting following the adoption of the original by-laws the stockholders determined that every certificate of stock have printed on it the aforesaid by-law. This by-law continued in existence until its repeal in March of 1949 and pursuant to the direction of the stockholders appeared on each and every share of stock held by the original incorporators, including the share of stock held by the plaintiff

herein. Plaintiff was aware of this provision at the time he accepted his certificate of stock. He attempted to explain that he thought the by-laws as originally enacted were improper for a business corporation. Some of the original 82 stockholders turned in their shares of stock and pursuant to the provisions of said by-law received the sum of $100 for each share.

Considerable testimony was adduced during the trial on the issue of whether or not defendant attempted to operate the corporation's activities at a profit. Some of the officers and directors, serving through the years, testified that in their efforts they attempted to operate as profitably as possible, consistent with what they thought to be the primary purpose of the corporation, namely, to operate a country club, whereas, other officers and directors, serving through the years, testified that they did not try to operate the facilities of the corporation for a profit.

The attorney for the defendant in the course of a colloquy told the court, "We at no time have contended that we do not make a profit, that we are not trying to make a profit and that we are not operating in an efficient manner." At another point in the trial he told the court that the defendant corporation has always made every effort to operate the club efficiently and profitably.

The officers who testified that they attempted to operate the corporation at a profit were the following:

Robert C. Lundahl said that it was his aim to operate as profitably as could be. However, he entertained no thought of paying a dividend.

Philip A. McDermott said, "We have to earn a profit in order to pay the bills." When asked if there was any discussion or proposal during his tenure in office to pay a dividend, he answered, "It would have been ridiculous to consider such a thing; at that time there was no such discussion."

John J. Fritsch testified, "We were trying to operate a country club and improve it to the best of our ability."

James R. Meador said he was not adverse to making a profit and that he wanted the corporation "run in the best possible manner." This witness pointed out that the corporation had made a profit during the years of its existence. He also said that he thought dividends might be paid but that in the past he never had in mind the payment of a dividend.

William P. Byrne testified that the corporation could earn enough money to pay a dividend in the future but that its financial condition in the past was such as to prohibit the payment of more than a small dividend.

Paul J. Horton testified that during the three year period he was a member of the board of directors the corporation was operated "definitely, with profit as a motive; and at the same time it was operated as a country club for the benefit of the members. I'd say both."

At a special meeting of stockholders held October 10, 1951, the minutes show that Gene Nahler, a past president of the defendant corporation, while president of the corporation had expressed hopes of paying a dividend. At this meeting he advised those present that under the present organization the corporation was a Missouri corporation for profit. There were other past officers and directors who testified similarly. Many of the past officers and directors testified that while the corporation made money, the payment of a dividend was not considered feasible by the board of directors. Contrary to the testimony of some of the officers was the testimony of Edward C. Mulcahy, a past president and director, who said he did not try to operate the club for a profit. There were other past officers and directors who testified in similar fashion.

An interesting sidelight on the issue of whether it was intended to operate the defendant corporation at a profit is found in the Voting Trust Agreement, which will be explained later in this opinion, wherein is contained a paragraph entitled "Dividends and Distributions." In this paragraph it provides that any distribution whether of cash, stock or otherwise, shall be made to the holders of the Voting Trust Certificates in accordance with their respective interests.

No cash dividend has ever been paid by defendant corporation during its existence. However, in 1949, the board of directors declared a stock dividend whereby they issued ten shares of stock for each share of stock held by the then stockholders. The stock dividend had the effect of transferring from the surplus account the sum of $59,400 to the capital account of the corporation in order to pay up the increase in the capitalization. Obviously, this surplus transferred to the capital account represented an accumulation of profits earned by the corporation in previous years.

The minutes of the stockholders' and directors' meetings held prior to 1958 show no complaints by plaintiff or any other shareholder about the manner of operating defendant corporation or its failure to pay dividends. The record shows that no stockholder ever urged the payment of dividends prior to the stockholders' meeting held in 1958.

Many of the past and present officers and directors who testified (some of whom were original incorporators) did not consider the shares of stock held by them an investment.

William P. Byrne, a former secretary and president of the corporation, stated that prior to the stockholders' meeting of January 1958, he was not aware of any stockholder holding his stock as an investment. However, he pointed out that an investment of $100 made in 1933 by a shareholder which could be sold in 1961 for $3840, was a benefit derived from an investment.

Edward C. Mulcahy, a former director, secretary, vice-president and president of

the corporation, said that no stockholder ever made an issue that the stock was being held by him as an investment.

Similar testimony was given by Willis W. Benson, a former member of the board of directors.

In interrogatories the defendant corporation was asked, "Since 1937, has the defendant recognized and acknowledged that there was a group of minority stockholders who held their stock as an investment and that the majority of the stockholders' primary idea was to operate a country club?" The defendant answered, "No information that any stockholders purchased or held stock as an investment. Originally all of the subscribing stockholders were members of the country club operated by defendant."

The following shareholders testified that they regarded their shares of stock as an investment: Walter Studt, Mrs. George Lytle, A. H. Stiehl, one of the Amicus Curiae and one of the original incorporators, when asked if he considered his original share as an investment, answered, "I did and I did not."

Plaintiff in his testimony said that he held his stock as an investor and considered defendant an ordinary and regular business corporation.

As heretofore shown, some of the officers and directors serving through the years, attempted to operate the facilities of the corporation for the purpose of making a profit, whereas, other officers and directors, serving through the years, said they did not try to operate the facilities of the corporation for the purpose of making a profit. Whatever their respective purposes may have been in this direction the audits and financial statements submitted as a part of the auditors' reports indicate that the corporation has consistently made a profit each year, with the exception of a nine month period in 1954 and the fiscal years 1955 and 1956. The books were audited annually throughout the existence of the corporation

by certified public accountants and their statements reflect net income before tax and other adjustments for the years indicated as follows:

| | |
|---|---|
| From beginning of corporation to Jan. 31, 1940 | $12,409.34 |
| Year ending Jan. 31, 1941 | 10,122.78 |
| Year ending Jan. 31, 1942 | 8,509.39 |
| Year ending Jan. 31, 1943 | 9,064.38 |
| Year ending Jan. 31, 1944 | 13,378.33 |
| Year ending Jan. 31, 1945 | 7,727.26 |
| Year ending Jan. 31, 1946 | 13,925.82 |
| Year ending Jan. 31, 1947 | 6,378.91 |
| Year ending Jan. 31, 1948 | 9,373.23 |
| Year ending Jan. 31, 1949 | 14,116.04 |
| Year ending Jan. 31, 1950 | 11,953.79 |
| Year ending Jan. 31, 1951 | 21,284.65 |
| Year ending Jan. 31, 1952 | 14,419.11 |
| Year ending Jan. 31, 1953 | 9,764.28 |
| Year ending Jan. 31, 1954 | 16,748.07 |
| Nine months ending Oct. 31, 1954 | * (3,287.60) |
| Year ending Oct. 31, 1955 | * (2,045.34) |
| Year ending Oct. 31, 1956 | * (4,949.37) |
| Year ending Oct. 31, 1957 | 7,514.84 |
| Year ending Oct. 31, 1958 | 7,753.46 |
| Year ending Oct. 31, 1959 | 12,383.03 |
| | $196,544.40 |

* Figures in parentheses indicate losses.

Adjustments to Surplus Account

| | |
|---|---|
| Through the years restoration of fixed assets charged against operations during prior periods were credited to surplus account | 22,706.39 |
| Net of adjustments of excess amount set up for provision of taxes on income and for other adjustments to surplus account | 14,964.45 |
| Net earnings after adjustments to surplus account for entire life of corporation | $234,215.24 |
| Less—Amount transferred in 1949 from surplus account to capital stock in payment of stock dividend declared | 59,400.00 |
| Earned surplus per balance sheet as of Oct. 31, 1959 | $174,815.24 |

The first few years of the defendant's existence were beset with many financial problems and the corporation was in financial distress and had to struggle for its existence. Because of the need for funds the east golf course was opened to the public for a period of from two to four years and for this same reason outside parties were held whereby the club's facilities were rented to nonmembers for the purpose of raising revenue. Because of the financial condition of the defendant corporation all subscribers of defendant's capital stock were requested to lend the

corporation $100 each. This request was made in the year 1933. The money raised was to be held by the first president, Mr. Wearen, as trustee, to be used only in the event the defendant corporation obtained certain concessions in its lease from the lessor. These concessions were obtained and the money was used for this purpose. In August of 1936 the sums of money advanced by the original stockholders were repaid.

At one of the meetings plans were laid for a membership drive for the purpose of building up the regular and social membership to a point where the east course could be closed to the public. However, the financial condition of the defendant corporation improved sufficiently to permit it to exercise the option in its lease to purchase the stock of the corporation owning the land and the improvements thereon. As a result title to the land and the improvements thereon were then obtained for a total purchase price of $248,000. The purchase price was paid in the following manner: $43,200 had been deposited on the option and was applied to the purchase price; a mortgage note payable to former stockholders of the corporate title owner of the land and improvements in the amount of $20,000 was assumed and a loan of $184,800 secured by a mortgage was obtained from the St. Louis Union Trust Company, St. Louis, Missouri. The allocation of the cost between land and buildings and improvements was as follows: land $120,879.31, buildings and improvements $127,120.69.

At the request of plaintiff, James P. Wilson, who was in the real estate business, made an appraisal of the land and improvements owned by the defendant corporation and placed a value on them of $1,850,000. His appraisal was made on the basis of using the land as a subdivision for the erection of multiple family dwellings and not for commercial buildings. He thought the clubhouse with its adjoining facilities and some acreage should be sold to an institution. He did not attempt to appraise the land and its improvements upon the basis of their use as a country club in the operation of golf courses, swimming pool and clubhouse purposes.

In the early years of the corporation necessary repairs to the clubhouse and other facilities were neglected to the extent that considerable deterioration had taken place. About 1952, the board of directors became concerned about the condition of the clubhouse and the other facilities and appointed a committee to inspect all the physical properties of the corporation to determine what repairs and improvements were needed and what efficiencies and economies could be effected in order to successfully operate the business of the corporation. It is unnecessary to detail the specifications of their findings except to show that the report indicated the properties were in a dilapidated and worn out condition and were infected with termites; that the electrical wiring was in a dangerous condition; that the kitchen was in a deplorable condition and that the heating system was inadequate to provide the hot water required. Many other defective conditions were found. It was determined that the buildings making up the clubhouse and other facilities were in immediate need of extensive repairs and improvements in order to preserve the buildings so as to continue their use. It was also thought that the making of the improvements would attract additional members.

While this inspection was taking place, because of defective wiring, the bathhouse and other facilities to the swimming pool burned. The board of directors upon learning of these conditions immediately set upon a program of repairs and improvements to the buildings. During the period the extensive repairs were made the entire men's grill was refinished, redecorated and refurnished. The swimming pool quarters, which had burned, were rebuilt

and improved. The dining room was reconstructed, redecorated and refurnished. An air conditioning plant was installed and other major repairs and improvements were undertaken. The cost of these repairs and improvements was paid from the earnings of the corporation, voluntary contributions on the part of club members and stockholders and borrowed money. At the beginning of the improvements the corporation borrowed $7500 and in the following year an additional $7500. In October of 1953 the corporation borrowed $150,000. Mr. John A. Nooney, a member of the board of directors at that time, assisted in the negotiation of the loan from the Community Federal Savings and Loan Association for $150,000. This loan was secured by a first mortgage on the corporation property. Part of this loan was used to pay off the existing indebtedness of the corporation and the balance was used for repairs and improvements.

In 1956 or 1957 the matter of renovating and revamping the dining room became a problem and for the purpose of carrying out the needed repairs, improvements and alterations $35,000 was borrowed from the Northland Bank and as collateral the corporation gave its second mortgage on the property.

For the purpose of aiding in the financing of these improvements and especially for the construction and alteration of the men's grill contributions were made by members, many of whom were not stockholders, to a fund which reached the sum of $20,000. In addition to the cash contributions Mr. Goode, a past president and past member of the board of directors, contributed steel uprights and steel cross beams that went into the area for the improvement of the family grill, the cocktail lounge and the men's grill. Another member contributed $500 of ready mixed concrete and another contributed window frames worth $250.

At the time the stock dividend was declared in 1949, the by-laws when amended contained a provision as follows:

"No obligation or indebtedness of the Company in excess of five thousand dollars for any one capital expenditure shall be incurred or contracted for without obtaining the consent and approval of a majority of the stockholders at any regular or special meeting."

This by-law restriction was amended in 1952 to limit expenditures for any one capital item to $7500 and in the aggregate for any one fiscal year to the sum of $15,000.

In April of 1954, it was further amended to read as follows:

"The Board of Directors are limited to a maximum expenditure on any one capital or major maintenance project of Twenty Thousand Dollars and a maximum of Forty Thousand Dollars on any group of capital or major maintenance projects in any fiscal year, provided, however, that such maximum sum shall be expended from income and, further, no such sums of money shall be expended from borrowed capital without approval of a majority of the stockholders at any regular or special meeting."

The record indicates that all loans made and expenditures for improvements incurred had the approval of the stockholders. It is significant to note that during the period these improvements were made William Kotsrean, now one of the Amicus Curiae, was a member of the board of directors. As we shall point out later, he now seems to be contending that these expenditures for improvements, made when he was a member of the Board, were improper and interfered with the payment of dividends.

The expenditures for capital improvements from 1952 through 1959 were as follows:

| 1952 | $19,903.89 |
| *1953 | 54,961.57 |
| 1954 (nine months) | 27,728.07 |
| 1955 | 7,503.17 |
| 1956 | 36,240.72 |
| 1957 | 68,256.47 |
| 1958 | 30,493.59 |
| 1959 | 29,259.18 |

* Includes $21,432.49 for rebuilding the bathhouse and $7,218.61 for refrigeration and air conditioning plant.

From the beginning of the defendant corporation's operations the board of directors authorized the rental of the clubhouse facilities, particularly the dining room, to outsiders for the giving of parties. Plaintiff introduced considerable evidence seeking to show that defendant could have obtained additional outside parties and thereby have made increased profits. In this connection plaintiff produced as a witness Theodore Karros who testified that he was catering manager of the Le Chateau Restaurant on Clayton Road in St. Louis County. His testimony consisted principally in describing accommodations of the place wherein he is employed. He described the types of parties handled, gave the type of clientele his employer handles and the demand for the places equipped to handle large sized parties. He also testified as to what days and what seasons the demand for such facilities for parties was greatest. This evidence was designed to show that the defendant corporation could have obtained more party bookings if it actively solicited more parties. In considering this witness' testimony it should be remembered that his employer was engaged in the restaurant business only and had no membership attached to its operations.

The testimony further showed that these outside parties were authorized and permitted for the purpose of raising additional revenue. However, it was always the object of the board of directors and the manager

of the club not to permit the outside parties to interfere with the affairs of the members of the club. In scheduling the outside parties the manager would not book any big parties on the days that the membership golf play was heavy. Some of the past members of the boards of directors and officers testified that they heard no complaints from members relative to outside parties, whereas, other directors and officers said that complaints were received from members about the outside parties.

The testimony of John Nooney who, as shown hereinbefore, is a certified public accountant and a past director and officer summarizes rather fully why these outside parties were authorized. He said they were an attempt to use some of the slack time of their regular employees and that was the real profit in the outside parties. In this connection the corporation and its clubhouse facilities would utilize the facilities of the country club at times when they were not being used by members of the country club. As one witness described the outside parties, "it's almost a by-product" of a country club.

Paul Lampe, a witness for plaintiff and manager of the country club, testified that in setting up the party activities he sees to it that they do not interfere with major membership functions. He said "I've got to keep in mind that the dues are the principal source of income and that has to be first."

Plaintiff offered in evidence a number of exhibits which were records kept by Paul Lampe whereby he attempted to make an analysis of each outside party showing the income and expense. These records were prepared following each party held and were kept for reasons of his own and not for the information of the directors.

John Nooney testified that during the period he was treasurer and president of the corporation he had instructed Paul Lampe that he need not keep a record of outside parties because the record did not show the true expense chargeable to these parties, but, he said, Mr. Lampe "was trying to build up

a figure to impress someone." He further testified that profits indicated in the record kept by Mr. Lampe were a mere guess. He explained that the benefit of the parties to the corporation came from using up the slack time of the regular employees when a membership function was not in progress.

William A. Huber, a certified public accountant with the firm that audited the books of the defendant corporation, testified that the records kept by Paul Lampe were not an accredited part of defendant's accounting system and that the records did not charge against the outside parties the expenses that should be charged and did not show the regular payroll necessary to carry on the parties and in that respect did not accurately reflect what profit, if any, was realized.

Paul Lampe in his testimony said more profit could not be made by having additional outside parties, because the increased activity over and above that which they had been handling would have necessitated bringing in extra help. He said the extra help gets a much higher wage because it is extra. He further testified that the increased activity would hurt to the point that the club could not maintain the properties, in that they could not keep them clean and in proper shape. He also testified that in many cases the kitchen is wholly inadequate. He further testified that up to a certain number the outside parties proved profitable and beyond that number additional expenses incurred made it questionable whether profits result. He explained that the records kept and introduced by plaintiff were kept for reasons of his own. It appears that these records kept by Paul Lampe, manager of the country club, have very little value. They probably record accurately the income from certain events and some of the prime costs of that event, but they do not, as indicated by the testimony of Paul Lampe and others reflect the indirect expenses constituting overhead expenses, which were, no doubt, increased by reason of these parties and do not include some of the payroll expense. Therefore, the profit and loss

from the parties as reflected by these records kept by the manager become of little value.

Paul Lampe estimated that about 250 outside parties are handled annually with 50 of said parties having in excess of 100 persons in each party.

Almost from the beginning of defendant's existence strenuous efforts were made by the officers and stockholders to have the stockholders who were not dues paying members of the country club turn in their stock for sale to the dues paying members of the country club so that it could be distributed among these members. Some of the stockholders had left the country club and gave up their membership without giving up their stock. Others had died and their stock found its way into their estates and ultimately into the hands of their widows. It was considered by the officers and directors of the defendant corporation to be a healthy condition for the dues paying members to own a share of stock. As early as March 11, 1937, the board of directors directed Mr. Eugene Nahler, the then president of defendant corporation, to communicate with the nonmember stockholders and to arrange with them to sell their stock to the active members of the country club. Some of the nonmember stockholders sold their stock and some did not. The thought among the officers and directors was that if the country club members owned a share of stock it would tend to keep them in the club. The efforts of the officers and directors to have the nonmember stockholders dispose of their stock was not only through personal contact but letters were sent to the stockholders over the signatures of the officers and directors.

In an effort to get a wider distribution of the stock into the hands of members of the country club, Mr. Jerome Tegeler, the then president of defendant corporation, suggested an increase in the authorized capital stock of the corporation so that more shares of stock would be available for distribution to the members of the country club. In

order to effectuate this plan a special meeting of the stockholders was held May 23, 1949, at which meeting the holders of 62 shares of stock were present in person or by proxy. The meeting adopted a resolution ratifying the action of the board of directors authorizing an amendment to the articles of incorporation, wherein the stated capital of the corporation would be increased from $6600 to $66,000 and the number of shares of authorized capital stock of the corporation would be changed from 100 shares with no par value having a stated capital of $50 per share to 660 shares of the par value of $100 each. The increase in the capitalization was to be paid by transferring from the available surplus of the corporation the sum of $59,400 to the capital account. The effect of this was to declare a stock dividend of $59,400 to the then present holders of the capital stock. The further effect was to give to each of the then stockholders 10 shares for each share of stock held. At the time this action was taken by the stockholders about one half of the subscribing stockholders were no longer members of the country club but they had continued to hold their stock. As previously said, the purpose of the stock split was to endeavor to get the nonmember stockholders to sell some of their stock so that it would be available for distribution to the members of the country club. There was no opposition by any stockholder to the plan to increase the capitalization and effect the stock split.

Despite this effort for a wider distribution of the stock it was found on March 14, 1950, that 297 shares of stock, almost one half of the outstanding stock, were held by persons who were not members of the country club and further steps were taken to acquire the stock from nonmember stockholders and have such stock distributed among the members of the club.

A number of plans were suggested and considered by the directors and stockholders, some of which proposed a sale of the portion of the property of the corporation, others proposed a lease of the portion of the property to trustees for an unincorporated association to conduct the country club. Under the plan by which a portion of the east golf course would be sold it was proposed to purchase from the members who were not golfing members of the country club, their stock at $260 a share which would have paid them a return of $2600 for the original $100 invested. All of these plans either failed or were rejected by the stockholders.

On July 11, 1951, the board of directors mailed to all stockholders the following letter:

"As you know, the main function of your corporation is to operate Norwood Hills as a country club; however, over the years several of the stockholders have been uninterested in the use and enjoyment of the property as a country club, and the ownership of their stock has become that of an investment.

"At the present time, stockholders desiring to sell their stock can do so at the rate of $100.00 per share and this stock is sold at the same price by the club to regular members with a limit of one share to each member. There are 11 such members seeking one share of stock, but none has been offered recently. This indicates that the price of $100.00 per share is no longer attractive to stockholders holding the stock merely as an investment, and that those stockholders anxious to have a club on the basis of each member holding one share of stock have exhausted the available stock; therefore, in order to continue the program, it will be necessary to purchase the stock of those merely interested in the investment at a price in excess of $100.00 per share.

"Your directors are presently working on a plan that will permit the stockholders to receive a greater price than the $100.00 now being offered, and to establish a corporation, the stock of

which will be held only by regular members enjoying club facilities and which corporation will be exempt from state and federal income taxes. Your corporation is now organized for profit and as such pays Federal and State income taxes, and is the only country club in the district on such a basis.

"The purpose of this letter is to advise all stockholders to hold their stock until such time as the directors can complete the overall plan, and submit it to all stockholders for approval. The plan must meet the requirements of the investment stockholders who want a larger price for their stock and also the requirements of those stockholders using the club facilities, who want to feel that they have a genuine country club, not subject to constant threat of being sold out by those primarily interested in the real estate."

On September 12, 1951, the defendant's president mailed to all of the stockholders a letter wherein it was suggested that the defendant corporation sell off a portion of the east golf course which he said could be sold without interfering with the west golf course or the buildings on the property and in this letter submitted an offer to purchase at $260 per share any or all shares of stock of the Norwood Hills Corporation which were owned by persons who were not golf members of Norwood Hills Country Club. This was the offer of purchase heretofore referred to. However, at a special stockholders' meeting of October 10, 1951, this plan was defeated. As a result of the many efforts of the officers and directors the shares of stock held by nonmember stockholders on October 31, 1959, had been reduced to 133 shares owned by 41 nonmember stockholders. Some of the member stockholders paid $384 a share for stock held by nonmember stockholders.

In 1949 E. G. Nahler, Walter Studt and the plaintiff were appointed as a committee of lawyers to draft a revised set of by-laws and proposed amendments to the articles of association. In the revision of the by-laws the provision in the original by-laws whereby a shareholder desiring to sell his stock must first offer it for sale to the corporation for a period of thirty days at and for the price at which said stock was originally issued by the corporation was repealed.

At a special meeting of the stockholders held February 20, 1952, the stockholders adopted a change in the articles of incorporation increasing the board of directors from 5 to 9 members. In 1952 there was a further revision of the by-laws. This revision provided for the appointment annually by the board of directors of a nominating committee, consisting of "seven stockholder golf members." It was the duty of the nominating committee to select and make known to the stockholders prior to the annual meeting the names of 6 candidates for the board of directors and provided that the 3 candidates receiving the highest number of votes at the annual meeting of the stockholders shall be declared to have been elected to the board for a term of 3 years. However, the by-laws did provide that nominees for the board of directors may be submitted from the floor at each annual meeting of the stockholders. These by-laws further provided for the appointment of the following committees: house, finance, greens and and grounds, golf and tournament, entertainment, admissions, membership, and swimming and tennis. The by-laws required the membership of these committees to be composed of stockholders who were golf members. The effect of these provisions of the by-laws was that the nominating committee and the other committees named had to be composed of stockholders who were members of the country club.

The record shows that thereafter there were no candidates for the board of directors other than the candidates selected by the nominating committee and that no one was elected other than those who were nominated by the nominating committee.

However, all directors and officers elected before and after 1952 were country club members.

No salary or fee was ever paid a director or officer of the corporation. This fact was known to plaintiff.

Plaintiff in his testimony said that he had been dissatisfied with the manner in which the corporation was being operated from the very beginning and that he made known his dissatisfaction to George Wearen, the first president of the corporation. In answer to an interrogatory, plaintiff said that he has objected continuously since that time to the defendant operating a country club. Plaintiff said that George Wearen tried to swing the country club into the corporation and that he told him that was never the original intention. He said that George Wearen answered that this was the means of making money and would enable the corporation to pay its leasehold charge. Plaintiff further said that his first objection to defendant operating a country club was made at a meeting in 1948 or 1949, and again in 1958 when through a proxy he filed a formal protest. However, in another part of his testimony he was asked, "Did you at any time file a formal protest to the Board of Directors of the Norwood Hills Corporation because they were operating a country club?" and he answered, "No, but I did talk to officers." He said his talks with the officers were all verbal and nothing was put in writing.

After Wearen, plaintiff's next complaint was made to Gene Nahler who succeeded George Wearen as president. Plaintiff said that his complaint to Gene Nahler was made at the corner of Broadway and Olive Streets in the City of St. Louis, at which time Walter Studt was present. He asked Gene Nahler what progress the corporation had made getting back into a business corporation. He said Gene Nahler told him that he had convinced the board of directors that the corporation had adopted "more of a business operation" and that he would report to the plaintiff later on. He said Gene Nahler asked him to attend the next meeting of the stockholders. In this connection Jerome Tegeler, a subsequent president, said that Gene Nahler at no time expressed himself to the effect that the operation of the corporation was to be other than that of a country club.

Plaintiff testified that he also objected to Dr. Leydecker in 1954, who was then president of the corporation. This complaint was made at a time when the Missouri Athletic Club was giving a golf tournament at the Norwood Hills Country Club. He said that, "Leydecker told me they would continue to try to get the thing on a basis so that they could be fair to the nonmember stockholder. He suggested to me, he said what they are trying to do is squeeze me out. I said, if that is what their intention was, they are going to fail. He said, would I sell for two hundred and fifty dollars a share. I said I would just about get my money back for that, and I wouldn't take it."

Plaintiff said he made other protests to other board members and officers, naming Edward C. Mulcahy, Jerome Tegeler and Benjamin Gross. In December 1958 he wrote letters to Roger A. Linson and Kenneth A. Baker who were candidates for the board of directors of defendant corporation. The letters are identical except for the acknowledgment by plaintiff of previous letters from the addressees. We recite the pertinent parts of the letter sent to each of the above candidates:

"I am sure you appreciate that the Norwood Hills Country Club is a corporation organized for profit and that for the last twenty-five years it has been operated exclusively for the use and benefit of stockholders who are members of the Club and for non-stockholding members of the Club, to the detriment of stockholders who are not members of the Club. I merely call this to your attention since it is my intention to proceed to have this

situation remedied, by litigation if necessary. I am hopeful that the Board of Directors of the company will recognize their duty to non-club members who are stockholders and see to it that their interests are protected, which they have not done heretofore.

"It is my impression, which I have learned via the grapevine, that it is the intention of the new board to borrow approximately $100,000.00 to install a new kitchen in the premises. Obviously, funds for the building of this new kitchen should have been made available by those who use it, to-wit the members of the Club, and this expense should not be charged to the stockholders. Therefore, I protest against mortgaging the premises to provide facilities for those stockholders who will receive the benefit of it, and those persons who are not stockholders who expect to enjoy the benefit of the improvement."

Plaintiff said that none of his efforts, related above, produced any results, adding, "I couldn't get a hearing even." When asked why he did not present a written protest, he said, "I had a sentimental reason for not causing trouble. I thought that eventually they would straighten out their method of doing business and get on a business basis." Plaintiff was never a member of the board of directors and never served as an officer. Many of the former directors and officers of the defendant corporation, who testified, said they had never heard a stockholder, including plaintiff, make a formal protest at a stockholders' meeting in regard to the operation of the corporation, other than the protest made by Mr. Fredrickson on behalf of plaintiff in January of 1958. Among the former directors and officers so testifying were Dr. James A. Meador, Robert C. Lundahl, Philip A. McDermott, Paul J. Horton, L. F. Thompson and Jerome Tegeler.

Apparently the first formal protest to be made was at the annual stockholders' meeting held January 14, 1958. At this meeting Edward Fredrickson, one of the attorneys for plaintiff in this case, attended the meeting as a proxy for plaintiff. He read to the stockholders present the following resolution:

"Whereas, this Corporation is organized as a business corporation for the purpose of operating or carrying on a business for profits;

"Whereas, the assets of the Corporation consist primarily of a valuable tract of land in St. Louis County which has been held by the Corporation for many years;

"Whereas, said tract of land and its present value results from the investment of funds by stockholders many years ago;

"Whereas, there has never been a payment of dividends to such stockholders, and consequently, they have never realized any return on their investment;

"Whereas, it is only fair and equitable that said stockholders should receive a fair return on their investment;

"Whereas, the principal source of income of the Corporation is dues paid by the golfing members, which dues are substantially lower than dues of any comparable organization;

"Now Therefore, be it Resolved, that the Corporation adopt a budget which shall provide for the necessary costs and expenses for the ensuing year and shall make provision for and take into account among other items the amount of money necessary for: 1. The maintenance and cost of operation of the Corporation;

"2. Payment or retirement of any indebtedness of the Corporation;

"3. A sinking fund to be held and used for the replacement of the facilities of the Corporation;

"4. Payment to the stockholders of a dividend amounting to a reasonable return on the fair cash value of the corporate assets.

"Be it Further Resolved, that in the absence of income sufficient to adequately provide for payment of the above items as well as all other items of cost or expense included in the budget, that the dues be increased so as to provide income sufficient to pay all items of cost or expense as fixed in the budget."

In the course of the discussion that followed his presentation of the resolution, one of the stockholders got up and vehemently asserted, "that the corporation was just to run a country club for their pleasure and if the stockholders didn't like that they were [are] invited to go to hell." The resolution was defeated at the meeting by a vote of 270 to 53.

Later Mr. Fredrickson attended a board of directors' meeting held January 28, 1958. At this board meeting he told the directors that he thought they knew about his attendance at the stockholders' meeting on January 14, 1958, and that some of the statements he heard there confused him as to the objectives and purposes of the corporation. Among other things, he asked the board of directors to declare what are the corporation's purposes and objectives, i. e., does the board propose to operate the affairs of the corporation as a business corporation or to operate a country club for the enjoyment and pleasure of the club members. He told the board that there has never been any attempt to earn a profit whereby a stockholder through his investment might hope to receive a dividend. He said he was met with a period of silence and no action was taken.

The next meeting attended by Mr. Fredrickson was a stockholders' meeting held January 12, 1960. He presented a resolution to the stockholders at this meeting and it was ruled out of order by the chairman.

It will be noted that this attendance was at a meeting that took place after this present law suit was filed. The present law suit was filed by plaintiff on December 30, 1958.

The stockholder who was charged with extending the suggestion "to go to hell," said he did not recall making such a statement but did say he could have well made it but could not recall making it.

There is no market for the sale of defendant's stock other than among the nonstockholder members of the country club. There are available purchasers among those members at a "book value" price of $386.00 per share.

Shortly after the stockholders' meeting of January 14, 1958, a group of stockholders organized a "Committee for the Preservation of Norwood Hills Country Club." This committee was instrumental in forwarding to each stockholder of defendant corporation a letter under date of March 3, 1958, wherein it was pointed out that the ownership of the club was not entirely in the hands of active members and that 150 shares of stock were owned by persons who were not members of the club. It was further pointed out that some nonmember stockholders had made an effort to unite and apparently would prefer to see the country club become a real estate investment instead of a country club. The letter further pointed out that stockholders who were not now members of the Norwood Hills Country Club had contributed nothing to its support and retained their equities solely for the purpose of personal gain. In the letter the other stockholders were asked to unite in common agreement and be committed to vote as a solid block or group for the purpose of maintaining Norwood Hills Country Club as a country club and the operation of such for the benefit of its members. The letter concludes with the request, "that you will join with the group in the only feasible way that we know can assure the member-stockholders that Norwood Hills Country

Club will always be the outstanding country club of our district and a showplace for us and our friends and a place which our children and our children's children will be able to enjoy for many years to come." The witnesses who testified to this matter said that the committee was formed because of the proposal made by Mr. Fredrickson at the stockholders' meeting on January 14, 1958.

Following the issuance of this letter a voting trust agreement was executed wherein 437 shareholders joined in the voting trust. The pertinent parts of this agreement show that the purpose of the agreement was to unite the voting strength of the stockholders in order to preserve the corporation and to provide for the carrying out of its purposes to operate a country club including golf courses, swimming pools and clubhouses. A paragraph in said voting trust agreement was devoted to dividends and distributions and provides that in the event any distribution, whether of cash, stock or otherwise, is at any time made by the corporation on the outstanding shares of capital stock, the voting trustees shall cause such distribution to be made to the holders of the voting trust certificates issued thereunder. As soon as the voting trust agreement was executed and set up the activities of the committee ended and the committee was disbanded and has not been active since that time. More than a majority of the stock in the defendant corporation was held in the voting trust.

Mr. Fredrickson in his resolution presented to the stockholders' meeting of January 14, 1958, asked for an increase in dues so as to provide income sufficient to pay all items of costs or expenses as fixed by the budget that he presented together with the payment of a reasonable dividend. The witnesses who testified on the subject of dues and prices charged at the country club said that every time dues had been raised the country club has lost members. It was pointed out that the defendant was operating a country club in competition with a lot of other country clubs in the area and that

it was a highly competitive business. These same witnesses also testified that the prices of drinks and meals is approximately the same at Norwood Hills Country Club as it is at other comparable places.

As related earlier in this opinion, plaintiff brought this action on his own behalf and on behalf of all other similarly situated owners of shares of stock of the defendant corporation. In the trial court no other stockholders sought to intervene or accept plaintiff's invitation to join with him in this law suit.

In answer to an interrogatory propounded to him by defendant plaintiff said that he did not know of any other stockholder who objected and protested to the action of the officers and members of the boards of directors in the operation of the defendant corporation as a country club. However, while this case was pending in the Supreme Court, before it was transferred to this court, some of the stockholders of defendant corporation were granted leave by the Supreme Court to file a brief as Amicus Curiae. In their brief they state that they find "themselves in sympathy with plaintiff appellant, the owner of ten shares of respondent's capital stock, and holding the same views of the issues in this cause as does the plaintiff appellant." This was the reason given for asking permission to file a brief. The stockholders who joined in this brief are William J. Kotsrean, owner of 43 shares, A. H. Stiehl 10 shares, M. F. McDonnell 10 shares, Peter J. Ward 8 shares, C. J. Murphy 10 shares, and Joy V. Allison, Executor of the Estate of Clarence R. Allison, Deceased, 10 shares— a total of 91 shares.

It is interesting to note that William J. Kotsrean had served on the board of directors and on many of the committees of the country club and was thoroughly familiar with the nature and scope of defendant's operations as a country club. The record is wholly devoid of any protests or complaints by him as to the nature of the operations and to the contrary the record indi-

cates that he approved and sanctioned some of its operations.

In a number of instances the trial court thought that certain evidence proffered was inadmissible but permitted the parties to make a record of same pursuant to Civil Rule 73.01(a), V.A.M.R. The evidence in this case took a wide range, some admitted by the court was somewhat similar to that rejected and preserved under Civil Rule 73.-01(a). We have considered all of the evidence taken under the rule to be admissible and have included it in our summation of the facts. Civil Rule 73.01(d).

In a deposition taken of plaintiff he was asked the following question: "Now, you have alleged that the directors acted illegally, oppressively and fraudulently. Can you tell me of any time when the directors acted fraudulently?" and he answered, "I think, the whole period when they conducted it as a club they acted fraudulently."

■ Before making our finding of facts, as we are obliged to do in this equity proceeding, it would be well to set out the boundaries of the road we are to follow in our review of this case.

■ The burden is on a minority stockholder of a corporation who seeks to have the courts intervene in corporate affairs and to dissolve a corporation to establish the essential allegations of his petition. Kessler v. United Agencies, Mo.App., 243 S.W.2d 779; Fletcher on Corporations, Vol. 13, p. 173, footnote 3. It is also true that such minority in employing aid of equity must show that it is otherwise remediless. Bates v. Werries, 198 Mo.App. 209, 199 S.W. 758.

■ Further, as said in Gaines v. Long Mfg. Co., 234 N.C. 331, 67 S.E.2d 355, 1. c. 361: "As a general rule, a stockholder may not maintain suit against the corporation to redress a corporate wrong unless and until he has exhausted reasonable efforts in seeking relief within the corporation; * * *."

Fletcher on Corporations, Vol. 13, § 5820, p. 202.

■ This is also true where the minority stockholder or stockholders are seeking to compel the declaration of a dividend. 13 Am.Jur., Corporations, § 710, p. 732.

■ It is our duty in this equity case to review the record de novo and give such judgment as the trial court should have given with due deference being accorded the decision of the trial chancellor, who had the advantage of observing and hearing the witnesses as they testified. Handlan v. Handlan, 360 Mo. 1150, 232 S.W.2d 944; Kessler v. United Agencies, supra.

■ Having in mind that this is an action seeking to dissolve the defendant corporation and to have the assets thereof sold by a receiver, we must be mindful of the rule set out and approved in Kessler v. United Agencies, supra, (243 S.W.2d 1. c. 780) as follows: "'An application for the appointment of a receiver for a corporation is addressed to the sound discretion of the trial court in view of the particular facts and circumstances presented. A trial court's action in appointing, or refusing to appoint, a receiver will not be disturbed in the absence of a showing that it abused its discretion, and that such abuse of discretion is prejudicial to the substantial rights of the party complaining.'" 19 C.J.S. Corporations § 1457.

■ We pointed out in the case of Kessler v. United Agencies, supra, that prior to the enactment of the general and business corporation laws of Missouri in 1943, courts of equity had no authority to appoint a receiver to liquidate a corporation, citing Ashton v. Penfield, 233 Mo. 391, 135 S.W. 938. However, under § 351.485 R.S.Mo. 1959, V.A.M.S., there is no question now but that the trial chancellor in a proper case has legal authority to appoint a receiver and decree liquidation of a corporation.

However, in Handlan v. Handlan, supra (232 S.W.2d l. c. 950), the Supreme Court cited from Niedringhaus v. William F. Niedringhaus Inv. Co., 329 Mo. 84, 46 S.W.2d 828, as follows: "Our policy has been and should be 'that courts should proceed with great caution in appointing receivers for corporations, and will do so only to prevent irreparable injury or to prevent justice from being defeated, and only when there is no other adequate remedy; that "this great power * * * ought to be exercised * * * ordinarily only in cases of imminent danger of loss, or of damage or of miscarriage of justice"'; and that neither bad judgment nor past acts or derelictions of directors would alone authorize such relief." We followed this rule in Kessler v. United Agencies, supra.

In the case of Ashton v. Penfield, supra, (135 S.W. l. c. 947) the court said: "And in a very late edition of an approved work (3 Cook, Corp. [6th Ed.] bottom p. 2490 et seq.) the general doctrine is put in this way: '[a] court will not appoint a receiver, because some of the stockholders disapprove of the management. A receiver will not be appointed at the instance of a stockholder, even though mismanagement is charged, there being no fraud and no danger of insolvency. There is a limit, however, to this rule. The powers of courts of equity to appoint receivers are very broad. * * *'"

The trial court made the hereinafter finding of facts which we think is abundantly supported by the evidence in this case. We adopt the trial court's finding of facts with some modifications and some additions. They are as follows:

1. The court finds that the defendant was incorporated January 30, 1933, in the State of Missouri, pursuant to Chapter 32, Article 7, Revised Statutes of Missouri, 1929, for the following purposes: "To purchase, hold, sell and lease real estate and 'to engage in the business of operating golf courses, clubhouses, swimming pools,' and in any other enterprise intended for pecuniary profit or gain * * *."

That since the date aforesaid the defendant has operated the Norwood Hills Country Club as a private country club and has never engaged in any other business.

2. The court further finds that the defendant was capitalized at $5,000 and authorized to issue 100 shares of stock of no par value; that 82 shares were subscribed, and later, 16 shares were returned to defendant and cancelled; that plaintiff subscribed to 1 share of stock for which he paid $100; that no stockholder subscribed for more than 1 share of stock; that all subscribing stockholders, including the plaintiff, became members of Norwood Hills Country Club; that plaintiff was a member of Norwood Hills Country Club from 1933 until August of 1941, participating in the activities and the functions of the country club and paying the regular dues for country club members as fixed by the defendant during the period aforesaid.

3. The court further finds from the preponderance of the credible evidence that the defendant was organized by the subscribing stockholders for the purpose of operating the Norwood Hills Country Club, a private country club; that the earnings of the defendant through the years were used to acquire, maintain and improve property to operate the country club. There was no evidence, either from witnesses or the records of defendant, that the subject of defendant paying a dividend was ever considered by the board of directors or any officer of defendant, or that the earnings of the defendant were ever such that the failure to declare a dividend was fraudulent, arbitrary or capricious.

The minutes of the stockholders' and directors' meetings held prior to 1958 show no complaint by plaintiff or any other shareholder about the failure to pay dividends. The record shows that no stockholder ever urged the payment of dividends prior to the stockholders' meeting held in 1958.

4. The court further finds that defendant originally leased the real property it now occupies, consisting of golf courses, swimming pool, clubhouse, etc., from the Brownstone Hills Realty Company; that in 1941 the defendant exercised an option included in the aforesaid lease and purchased said property of some 330 acres; that defendant has always used said property exclusively for the operation of Norwood Hills Country Club; that defendant sold 13 acres of said property, which were not needed for the operation of the country club, which sale was approved by the stockholders, and that the price received therefor has never been challenged on the grounds of inadequacy.

5. The court further finds that defendant's officers and members of defendant's boards of directors, throughout defendant's history, in addition to being stockholders were always members of the Norwood Hills Country Club and served without compensation; that defendant's primary objective through its management was the operation of the country club; that it determined the membership of the country club, the dues paid by club members, the appointment of working committees, the scheduling of club parties and outside parties and tournaments and all other country club functions.

6. Plaintiff in his petition alleges in paragraph 4 thereof that he filed this action "on his own behalf and on behalf of all other similarly situated owners of shares of stock of defendant corporation." The court further finds that no other shareholder had appeared in the trial court and asked to be joined as a party with the plaintiff in this suit, nor authorized plaintiff to prosecute the action on his behalf, and at the time of the trial in the Circuit Court the plaintiff was the only complaining shareholder and that he alone is prosecuting this suit. That since the cause was tried in the trial court, other stockholders holding a total of 91 shares, finding themselves in sympathy with plaintiff, have received permission to file a brief in this court as Amicus Curiae.

7. The court further finds that subsequent to defendant's incorporation some subscribing stockholders left Norwood Hills Country Club without surrendering their shares of stock to defendant; that others died and their shares of stock passed to their widows or estates; and in time some shares were held by those who are no longer members of the country club.

8. The court further finds that in 1949, defendant, being aware that stock was held by those no longer members of the country club and also being aware that members of the country club who were not shareholders in defendant's corporation, desired to purchase a share of stock, amended its charter so that it became authorized to issue 10 shares of stock for each outstanding share of stock, or a total of 660 shares of stock; that in order to effect this increase in the total number of shares of stock authorized the board of directors with the approval of the stockholders transferred $59,400 from the earned surplus account, representing accumulated earnings, to the capital account; that it was the plan of defendant and defendant urged that nonclub members who were shareholders sell their stock, one share a person, to the members of the country club; that in 1951, nonclub member stockholders owned 297 shares and by October 31, 1959, the number of shares owned by nonclub member stockholders was reduced to 133 shares held by 41 nonclub members.

9. The court further finds that those who are members of the country club and who purchased a share of stock made the purchase in the belief and for the sole purpose that defendant should continue to operate the Norwood Hills Country Club as a private country club; that the price paid for said shares of stock ranged from $100 to $384 per share.

10. The court further finds that in 1951 another plan to enable the nonclub member stockholders to dispose of their stock was submitted to the stockholders, but it was turned down by the stockholders.

11. The court further finds that amendments made in the by-laws of the corporation in 1952 did not alter the situation in respect to nonmember stockholders serving in the management of the defendant. The evidence establishes without exception that all officers and members of the boards of directors of defendant corporation from its inception were also members of the country club.

12. The court further finds that at various times before and after 1952 defendant borrowed money for needed improvements which action was approved by the stockholders; that there is nothing in the record that shows that in the making of these needed repairs and improvements the officers and directors either misapplied or wasted the assets of the defendant corporation; that from year to year the earnings of defendant varied and that in addition to the borrowed money some of the accumulated earnings were used for the needed repairs and improvements. There is no evidence that the management of defendant corporation, through its officers and directors, was ever guilty of misconduct, negligence or failure to perform faithfully all of the duties and obligations imposed by law on them in the course of handling and managing defendant's affairs; and the court affirmatively finds from the evidence that those managing defendant's affairs have not acted illegally, oppressively or fraudulently to plaintiff's interests or misapplied or wasted the assets of the defendant corporation.

13. The court further finds from the evidence that only plaintiff and a few other nonmember stockholders claim that their stock was purchased as an investment. The court further finds that many other stockholders testified that their stock was not purchased as an investment. The court further finds that defendant's management recognized that plaintiff claimed he purchased his stock as an investment.

14. The court finds from the evidence that the principal market for the sale of defendant's stock is to members of the Norwood Hills Country Club, since it appears from the evidence that the operation of the country club is the defendant's only business and has been for years. The court finds no evidence in the record regarding the present value of defendant's properties used as golf courses, clubhouses, etc., in connection with the operation of Norwood Hills Country Club, and the court in the absence of evidence to the contrary finds that the reasonable book value per share of the capital stock of the defendant corporation is $384.00.

15. The court further finds from the evidence that the voting trust mentioned in the evidence was formed by a group of stockholders representing a majority of defendant's stock for the purpose of enabling defendant to continue to operate Norwood Hills Country Club as it has since defendant came into existence; that the voting trust controls the management of defendant. However, the court finds no evidence that the voting trust or its purpose is unlawful or contrary to the good interests of the defendant's operation.

16. The court further finds that many persons including members of Norwood Hills Country Club, officers and members of the Board of Directors of defendant corporation and persons who purchased stock in defendant corporation, all in the belief that defendant legally operated the Norwood Hills Country Club and in reliance on said belief have become pecuniarily involved in said operations, to-wit, officers and members of the board of directors have devoted much time and gave of their talents to the management of defendant's corporation without compensation; many persons who have joined Norwood Hills Country Club throughout the years paid initiation fees, numbering 243 regular members since 1954; members of Norwood Hills Country Club who purchased stock in defendant corporation paying a price from $100 to $384 per share; members of the country club, some of whom were stockholders who contributed large sums of money, on one oc-

casion in evidence, amounting to more than $20,000 to improve defendant's properties.

17. The court further finds that the original by-laws provided that the shares of stock could not be transferred on the books of the corporation until they had been offered for sale to the corporation for a period of 30 days at the price for which the stock was originally issued and that this by-law was printed on every certificate of stock issued, including plaintiff's certificate. This by-law continued in existence until its repeal in March of 1949.

18. The court further finds that some of the officers and directors serving through the years attempted to operate the facilities of the corporation for the purpose of making a profit, whereas, other officers and directors did not try to make a profit, nevertheless, the court further finds that whatever may have been their purposes the defendant corporation has consistently made a profit each year with the exception of a nine month period in 1954 and the fiscal years of 1955 and 1956 and that from its beginning until October 31, 1959, it has earned the total sum of $234,215.24, which the court finds to be more than a reasonable earning on the original remaining investment of $6600. The court further finds that while the defendant corporation made money through the years the payment of a dividend was not considered feasible by the boards of directors.

19. The court further finds that plaintiff failed to prove that defendant could have obtained additional outside parties. Further, that plaintiff failed to prove that additional outside parties would result in increased profits. The court finds that the outside parties may have been profitable only to the extent that they used some of the slack time of the regular employees of the defendant corporation, i. e., the clubhouse facilities would be utilized at times when they were not being used by members of the country club. The court further finds that it would be a matter of surmise and speculation to rely upon the records kept by Paul Lampe, manager of the country club, because said records did not reflect the indirect expenses constituting overhead expense, did not include some of the payroll expense, and they were not a part of the accounting system of defendant. The court further finds that it was not unreasonable for the management of said country club to see to it that the outside parties did not conflict with the membership functions.

20. The court further finds that the first formal protest ever made by plaintiff, to either a stockholders' meeting or a board of directors' meeting in regard to the operations of the corporation was at the annual stockholders' meeting held January 14, 1958, and to the board of directors' meeting held January 28, 1958. The court further finds that no other stockholder during the history of the corporation has ever objected to the action of the officers and members of the board of directors in the operation of the defendant corporation in any respect.

Before discussing the points relied on by plaintiff, it is well to discuss what appears to be an anomalous situation regarding the organization of defendant corporation. As the evidence shows, prior to the organization of the defendant corporation the North Hills Country Club had operated a country club under a pro forma decree of incorporation. This country club had apparently leased the premises now owned by the defendant corporation. As shown in the evidence, it met with financial difficulties and ceased operations and was liquidated. As we said heretofore, it was clear that for all practical purposes the defendant corporation was a successor to the North Hills Country Club. The testimony shows that the subscribing stockholders to the defendant corporation had made contributions to the old North Hills Country Club in order to keep it going and the new corporation was organized for the purpose of attempting to salvage the investment made by these members of the old

corporation and in an effort to retrieve some of the money advanced to the old corporation. As some of the beginning stockholders said, the defendant corporation was merely a reorganization of the North Hills Country Club. There can be little doubt that the only purpose of the defendant corporation from the very beginning was that of operating a country club which was to be known as the Norwood Hills Country Club.

Despite what plaintiff said in his testimony we think that he considered the defendant corporation as a continuation of the old country club that was operated under the name of the North Hills Country Club for it will be remembered that he testified he contributed between $1900 and $2500 in order to keep the old North Hills Country Club going. In the reorganization when the defendant corporation was organized he held one share of stock and had contributed only $100. In his discussion with Dr. Leydecker in 1954, when he was asked if he would sell his stock for $250 a share (he had 10 shares) he answered, "I said I would just about get my money back for that, and I wouldn't take it." Obviously, the money that plaintiff had in mind was the money that he had contributed to the old North Hills Country Club, because the only money advanced in connection with the new corporation was the $100 that he paid for a share of stock.

The question that readily comes to mind is why did defendant organize under Article 7 of Chapter 32, which is the Article governing the incorporation of manufacturing and business companies? As said by defendant in its brief, at the time the defendant corporation was organized, it was the opinion of many lawyers in this state that a pro forma decree corporation could not hold title to real estate in Missouri because of the decision in Rockhill Tennis Club of Kansas City v. Volker, 331 Mo. 947, 56 S.W.2d 9. In that case the plaintiff, a tennis club organized and incorporated under a pro forma decree of the Circuit Court of Jackson County pursuant to the statutes at the time governing the incorporation of organizations for benevolent, religious, scientific and educational purposes, was, as the court said, (56 S.W.2d l. c. 15) "not properly incorporated or possessed of the powers and franchises of a corporation, and, should its corporate existence and franchise be called in question by the state by quo warranto, or in any proper proceeding, its incorporation should be declared void." In that case it was held that the tennis club could not compel specific performance of a contract to convey land to it for athletic activities. This case was decided by the Supreme Court of Missouri in 1932, prior to the incorporation of the defendant corporation. At the time defendant was incorporated there was no other law authorizing an incorporation of a not for profit corporation, other than Article 10, Chapter 32, R.S.Mo. 1929. As pointed out in the case of Hillcrest Country Club v. United States, D.C., 152 F.Supp. 896, the organizers of the Hillcrest Country Club were faced with the same predicament as defendant herein and were forced to organize under the business and manufacturing companies section of the law despite the intention of the incorporators not to earn money to pay dividends. The court in that case pointed out that the only corporate vehicle available to the country club under the circumstances was the then manufacturing and business corporation act and so it was with the defendant in this case.

We now take up the points relied on by the plaintiff. In the first point plaintiff complains that the court erred in not reaching the following conclusion of law: "that defendant, being organized under laws relating to business concerns, and being organized 'for pecuniary profit or gain,' had as its sole purpose the pecuniary gain of its stockholders." Before answering this point, it is well to point out that plaintiff in his brief is no longer complaining about defendant corporation operating a private

country club. It will be remembered that throughout his entire testimony he had made complaints about the operation of the defendant corporation as a private country club and in his deposition said that the whole period when the defendant corporation operated as a private country club the management acted fraudulently. Now plaintiff states in his brief that "the fact that defendant has operated a private country club is of no significance, because plaintiff is not complaining of that fact." The real complaint, he said, is that the corporate purpose of making money has been abandoned, stating that the fundamental purpose of the defendant, as expressed in its articles of incorporation, is to operate for the pecuniary gain of all of its shareholders. Plaintiff cites many authorities to show that the ultimate object of every ordinary trading corporation is the pecuniary gain of its stockholders and that it is for this purpose the capital has been advanced. In support of this rule plaintiff cites In re First National Safe Deposit Company, 351 Mo. 423, 173 S.W.2d 403; Ashton v. Penfield, 233 Mo. 391, 135 S.W. 938; Dodge v. Ford Motor Co., 204 Mich. 459, 170 N.W. 668, 3 A.L.R. 413; Miner v. Belle Isle Ice Co., 93 Mich. 97, 53 N.W. 218, 17 L.R.A. 412, and other authorities. All of these cases involve either banking, commercial or manufacturing corporations and in most of them alleged misappropriation of the assets of the corporation or misconduct of the majority stockholders or boards of directors have been alleged. Neither defendant nor this court has any quarrel with plaintiff insofar as these authorities and the rules announced therein are concerned. We find little help from these cases in determining what profit or gain, if any, should be achieved in the management of a private country club by the majority stockholders and the defendant's board of directors. In further support of his first point plaintiff cites many cases, wherein it has been held that the majority stockholders of the defendant are trustees for plaintiff and other minority stockholders and as such are obliged to exert an honest, conscientious effort to achieve pecuniary gain for all its stockholders. No useful purpose would be served in citing these cases and analyzing their holdings. We have studied them and analyzed them and, here again, we have no quarrel with plaintiff insofar as the rules of law stated therein govern the actions of majority stockholders and the boards of directors of corporations.

We think the simple and plain answer to this point urged by plaintiff is the fact that the majority stockholders and the boards of directors from the beginning of the corporation to the year ending October 31, 1959, have earned $234,215.24 on an original paid-in capital of $6600, which amount when reduced to earnings per share for this same period of time show net earnings over the period (approximately 27 years) on plaintiff's stock of $3548.70. This amount of net earnings on stock now held by plaintiff when reduced to average earnings amounts to $131.43 per year on plaintiff's original investment of $100.00, an average annual earning in excess of 130 per cent.

It is true that these earnings have not found their way into the hands of plaintiff through the medium of dividends. These earnings were used by defendant corporation to expand and develop its physical properties. They are represented in the cash, accounts receivable and physical assets of defendant's corporation. However, it cannot be overlooked that the increase in the value of the assets could only come about through the use of accumulated profits and the contributions referred to in the statement of facts. Plaintiff in his brief constantly states that the purpose of defendant corporation is to earn money for the benefit of its stockholders. No doubt, this is true, as we have said, in the ordinary trading corporation. However, defendant's primary purpose set out in its articles of incorporation was "to engage in the business of operating golf courses, clubhouses,

swimming pools, * * *." It is true that this was to be done, as stated in the articles of incorporation, for pecuniary profit or gain. As we have pointed out the sole operation of the defendant corporation has been that of a private country club and the intended pecuniary profit or gain to be derived must be viewed in the light of this type of operation. We think, considering the type of operation defendant was engaged in, that the "pecuniary profit or gain" made was unusually large under the circumstances.

After referring to the "new stockholders that came into the corporation after 1952," plaintiff, in his brief, asks the question, "are these persons attempting to earn money for the benefit of all stockholders including those who are not members of the country club?" He claims that the answer to this question is really determinative of this whole lawsuit. As we have pointed out, many of the officers and directors who served have said that their efforts were directed toward making a profit, however, not necessarily for the purpose of declaring a dividend, while other officers and directors said they did not intend to make a profit. We answer this question by pointing to the record, which shows that the officers and directors managed and controlled the affairs of the corporation in such a manner as to show large profits with the exception of a few years as indicated.

Plaintiff throughout his brief constantly contends that the evidence shows that it is the intent and desire of the officers to operate a country club for the benefit and pleasure of the members of the country club. This, no doubt, is true because the major revenue of the country club comes from the initiation fees and dues of the members who join a country club for the purpose of obtaining the benefits offered. No doubt, some of the accumulated profit, if not all, is the result of the payment of initiation fees and dues. Plaintiff contends that to operate the country club for the benefit and pleasure of its members is a direct contradiction to the

corporate purpose, namely, "for the pecuniary profit or gain of the stockholders." "The proof of the pudding is in the tasting." The proof that defendant can operate a country club for the benefit and pleasure of its members and still make a profit has been demonstrated in its financial statements prepared each year by certified public accountants.

Plaintiff further states that the profits from outside parties could be increased by increasing the number of such parties. He contends there is a studied intent not to do this. As we have pointed out, plaintiff's evidence fails to show that increased profits would follow an increased number of parties. The contrary was asserted by the manager of the country club who said that increased parties would entail the need for additional help which he declared to be costly. Frankly, there is no reliable evidence on which this court can conclude that net profit did result from the giving of outside parties.

Plaintiff in his petition alleges that there is no intention or desire on the part of those in control of the management of defendant corporation to ever pay a reasonable dividend to stockholders. We do not construe this to be a charge that the directors of defendant corporation failed to declare dividends in the past when such declaration was a duty. Whatever plaintiff means by this allegation it is the rule that individual stockholders cannot sue the corporation for failure of its directors to declare a dividend until they have exhausted means of redress through the corporation. 13 Am.Jur., Corporations, § 710, p. 732. The record fails to show that plaintiff ever called upon the directors of the defendant corporation to declare a dividend, except inferentially, at the January 1958 meeting when he called for a budget that would provide for a dividend in the future. In this connection it should be pointed out that the directors of a corporation have a large discretion with which the courts will not interfere unless bad faith or abuse of dis-

478

cretion are shown. The reason for the rule is obvious. It may be and often is for the best interests of a corporation and its stockholders to reserve profits for the purpose of developing and improving its properties. Niedringhaus v. Niedringhaus Inv. Co., supra. We find no evidence in this case demonstrating bad faith or abuse of discretion on the part of the directors in not declaring a dividend in the past.

■ It seems clear to us that the majority stockholders and the past officers and members of the boards of directors, whether intentionally or unintentionally, or by sheer accident, operating within the framework of the corporate purpose, have earned sizeable profits in the past for all stockholders and have properly used some of the profits for improvement of defendant's properties. They have fulfilled their obligation under the law to the minority stockholders. Plaintiff has failed to show that defendant's management has acted illegally, oppressively or fraudulently and has failed to show that the corporate assets are being misapplied or wasted.

■ As to the future purpose and intentions of defendant's management we are somewhat concerned about the statements appearing in defendant's brief, which are contrary to its statements made at the trial and in its pleadings. These statements in the brief are to the effect that it has been and is the plan of defendant to operate a private country club without earning money for its stockholders. As we have found, the operation of a private country club by the defendant is entirely within the scope of its powers under its articles of incorporation. Despite what we have said earlier in this opinion about the anomalous situation existing in the law in 1933 that prohibited the defendant from organizing as a nonprofit organization, the fact is that defendant is organized as a business corporation for the purposes heretofore described and with the intention of pecuniary profit or gain. We think it incumbent upon defendant's man-

agement in the future to be constantly aware of these purposes and intention in the management of defendant's affairs. It is obvious that the management in the past has not considered defendant as a nonprofit organization because the record shows that defendant's management has been aware of its corporate purpose and intention and has paid many thousands of dollars in State and Federal Income Tax on profits earned.

■ The next point urged by plaintiff is that the trial court erred in holding that plaintiff ratified defendant's operation as a private country club. Whether or not defendant lawfully operated a private country club within its charter provisions and powers was a live and ever present issue before the trial court. We think the trial court was correct in holding and concluding that plaintiff ratified, in every respect, the operation by defendant of a private country club. As we have pointed out heretofore, plaintiff has abandoned this contention and now holds, in his brief under this point, that such an operation was within the corporate charter and purposes of the defendant corporation. Whether or not the defendant corporation had the authority under its charter to operate a private country club is no longer an issue in this court.

■ In his next point plaintiff contends that the trial court erred in concluding that the doctrine of laches barred his right to equitable relief. Our holding that the defendant's management has fulfilled its obligation under the law to the minority stockholders and that plaintiff has failed to show that defendant's management has acted illegally, oppressively or fraudulently and has failed to show that the corporate assets are being misapplied or wasted makes it unnecessary for us to determine whether or not plaintiff was guilty of laches and, therefore, not entitled to equitable relief. That issue is moot in this court.

This opinion is quite lengthy due to our desire to state fully all of the facts showing

that defendant operated a private country club from the very beginning of its organization to the time of trial. We have done so because during the trial plaintiff denied this was true in the beginning corporate life and constantly contended throughout the trial that defendant corporation acted fraudulently in the operation of a private country club and that such operation was in derogation of its charter powers. While it is true that plaintiff has abandoned this contention in this appeal, we thought it best to adjudicate this right of defendant to so operate a private country club under its charter so that there could be no future question raised as to this right.

The judgment and decree is affirmed.

SAM C. BLAIR and PHIL H. COOK, Special Judges, concur.

PER CURIAM.

Plaintiff has filed a motion for rehearing or in the alternative to transfer to the Supreme Court. For the most part, plaintiff reiterates and re-argues in his motion many of the contentions he asserted in his brief. However, some of the matters contained in the motion for rehearing indicate some misunderstanding on the part of plaintiff.

In our opinion we said, "for all practical purposes defendant was a successor to North Hills Country Club." Plaintiff objects to this language contending that the defendant corporation is organized for pecuniary gain while the predecessor corporation prohibited pecuniary profit to its members and contending further that "it is impossible for this court or anyone with a smattering of legal education to find that 'for all practical purposes the one corporation was a successor to the other.'" The statement complained of and appearing in our opinion was taken from the opinion of the Supreme Court of Missouri, wherein the cause was transferred to this court on the ground that the Supreme Court lacked jurisdiction of the appeal. The Supreme Court having found that defendant for all practical purposes was a successor to North Hills Country Club, we could not find otherwise. However, we heartily agree with the statement contained in the Supreme Court opinion. If plaintiff will examine the testimony of his witness, A. H. Stiehl, and others, he will find sufficient support for the aforesaid statement. Also, it will be recalled that we pointed out in our opinion that plaintiff was seeking to recover through the defendant corporation sums of money that he had advanced to the North Hills Country Club before it became insolvent.

Plaintiff makes the further contention that we have laid down a novel rule of law in holding "that if a corporation earns profits by accident or even unintentionally then the majority stockholders have exerted 'an honest, conscientious effort to achieve pecuniary gain for all of the stockholders.'" Of course, the opinion does not so hold. It is true that we did say "whether intentionally or unintentionally, or by sheer accident, operating within the framework of the corporate purpose" the past officers and members of the boards of directors have earned sizable profits. We had in mind that some of the officers and directors did state, as the opinion shows, that they did not operate the facilities of the corporation for a profit, whereas, many other officers and directors said they attempted to operate as profitably as possible. What we did say in conjunction with the aforesaid statement was that plaintiff has "failed to show that defendant's management has acted illegally, oppressively or fraudulently and has failed to show that the corporate assets are being misapplied or wasted."

Plaintiff contends that we have expended a great amount of time and a large portion of the opinion in resolving a nonexistent issue. He says that when we stated "fully (in our opinion) all of the facts showing that defendant operated a private country

club from the very beginning of its organization to the time of trial * * * because during the trial plaintiff denied this was true in the beginning corporate life" that this was not an issue in the case and that plaintiff never contended it was. He then says "even if we assume that at one time plaintiff had denied such fact, there can be no doubt it was not an issue *before this court*," and asked "why, then, did the court belabor this point?" If plaintiff was at all familiar with the record in the trial court, it would become evident that this question was constantly before the trial court and constantly in the mind of the trial judge, as disclosed in some of the numerous colloquies the trial court had with the attorneys and, as we pointed out in our opinion, when plaintiff was asked, "Now you have alleged that the directors acted illegally, oppressively and fraudulently. Can you tell me of any time when the directors acted fraudulently?" Plaintiff then answered, "I think, the whole period when they conducted it as a club they acted fraudulently."

It is difficult to know how plaintiff can now state that this was not an issue in the case and that he never contended it was when his own answer to the question propounded clearly and unmistakably puts before the trial court the issue whether or not defendant corporation fraudulently and illegally operated a private country club "from the very beginning of its organization." We fail to be misled by plaintiff's statement in his brief filed in this court that it was not an issue before this court. We review a case in the light of the issues tried in the trial court and will not be led up a blind trail when the issues tried in the trial court are presented here for review.

Plaintiff asserts that the court erred when it found that defendant's net income "from beginning of corporation to January 31, 1940 (amounted to) $12,409.34," contending "there is simply no evidence to support such finding and it can only be a mistake," and

that "the trouble with this finding is that there is absolutely no foundation to support such conclusion." An examination of the record discloses the supporting evidence. If plaintiff will refer to his Exhibit 16, which is a report of the certified public accountants who examined the books of the defendant corporation for the year ended January 31, 1941, he will find within his own exhibit an exhibit marked "B" titled "Statement of Surplus Account for the Year ended January 31, 1941," and if he will then refer to the analysis of the "EARNED SURPLUS" he will find thereunder the following: "Balance, January 31, 1940, $12,409.34." Anyone with a minimum of business or accounting knowledge knows that this represents undistributed earnings accumulated from the beginning of the corporation to January 31, 1940. We are sure that plaintiff readily agrees that no distributions of surplus were made prior to January 31, 1940, therefore, this figure represents the net earnings for the period prior to that date.

Finally, plaintiff contends that the court erred when it found as a fact "that in order to effect this increase in the total number of shares of stock, $59,400 was transferred from earned surplus account to the capital account," further stating that "because the court overlooked the fact that the number of shares could be increased without changing the capital account." Of course, the number of shares could be increased without changing the capital account but that is not what was done. A reading of the minutes of the board of directors' and stockholders' meetings and an examination of the books of the defendant corporation as reflected in the auditors' statements clearly show that the number of shares was increased and that $59,400 was transferred from the earned surplus account to the capital account.

Plaintiff's motion for rehearing or in the alternative to transfer to the Supreme Court is overruled.