Dolores **GONSETH** and Frances Gaston, Individually and as Shareholders of K & K Oil Company, a Corporation, suing on behalf of themselves and all other shareholders, and for the benefit of the Corporation, Plaintiffs-Appellants,

v.

K & K OIL COMPANY, a Corporation, Charles Knorpp, Mildred Knorpp and Max Patten, Defendants-Respondents.

No. 8830.

Springfield Court of Appeals.

Missouri.

Feb. 24, 1969.

Henry Warten, Warten & Wells, Joplin, for plaintiffs-appellants.

Ralph Baird, Max Patten, Joplin, for defendants-respondents.

TITUS, Judge.

The Circuit Court of Jasper County entered judgment for defendants on plaintiffs' amended petition in equity. Plaintiffs appealed when their post-trial motion was overruled, and by their brief entreat us to reverse and remand with directions to the trial court to [1] enter a decree declaring plaintiff Dolores Gonseth (Gonseth) and defendant Charles Knorpp (Knorpp) to be the sole and equal owners of the assets of the K & K Oil Company, a Missouri corporation, and [2] appoint a receiver to take charge of and wind up the corporation's business and distribute its net assets between Gonseth and Knorpp.

We need not recast all the testimony and exhibits in detail, for many of the viable issues at trial have been abandoned on appeal because not preserved in the "Points Relied On" in plaintiffs' brief. Hastings v. Coppage, Mo., 411 S.W.2d 232, 235(3); Sup.Ct. Rules 83.05(a) (3) and (e).

As in other equity suits, we review the record de novo for the purpose of ascertaining to what relief, if any, plaintiffs are entitled, bearing in mind that unless we conclude the trial court's findings on disputed testimony are clearly erroneous, we are to defer to the findings of the chancellor who observed the witnesses and heard them testify. Ramacciotti v. Joe Simpkins, Inc., Mo., 427 S.W.2d 425, 426(2), 433(11).

Gonseth and Knorpp, acquaintances for many years, had some business dealings together prior to 1954 and were fairly equal in their exposure to formal education. Knorpp and one A. L. Kissinger, partners doing business as the K and K Oil Company, rented a truck stop owned by Gonseth. At Knorpp's suggestion Gonseth purchased Kissinger's interest for $10,000 and, according to a written agreement dated August 21, 1954, prepared by attorney Max Patten (Patten), Gonseth and Knorpp became equal partners in the K and K Oil Company. Knorpp managed the business. Gonseth took no part in the affairs of the partnership, except that she was consulted on matters which were more than routine in nature. The business flourished, and Knorpp suggested a corporation be formed to limit their liability in the event a serious accident should occur. On June 6, 1956, Gonseth, Knorpp and Patten executed articles of association (prepared by Patten) for the purpose of forming the K and K Oil Company, a Missouri corporation. Certificates of incorporation and authority to commence business were thereafter duly issued. The articles have never been amended.

At the time of incorporation Missouri law (§ 351.050, RSMo 1949) required that three or more subscribers to the shares act as incorporators and that "the number of directors of a corporation shall not be less than three." § 351.315, RSMo 1949. The articles, inter alia, authorized the K and K Oil Company to issue $5,000 in capital stock divided into 50 shares of common stock with a par value of $100 each, and required there be three directors of the cor-

poration, each of whom was to be a shareholder. The subscribers listed were Gonseth—24 shares, Knorpp—24 shares, and Patten—2 shares. The incorporators swore and acknowledged "the fifty shares have been subscribed and actually paid up in lawful money." Patten and his office were respectively designated as the registered agent and registered office of the corporation.

■ The partnership had assets of $42,-802.91 at the time of incorporation, all of which were transferred to the corporation via a "venture" account and thereafter distributed to various accounts on its books. Upon the transfer of such assets the partnership became functus officio and ceased to exist. Schneider v. Schneider, 347 Mo. 102, 109, 146 S.W.2d 584, 589(12); 68 C.J.S. Partnership § 344, p. 851. The corporation paid for the transferred assets by (1) issuing $5,000 in capital stock, (2) assuming liabilities of $13,771.81, and (3) giving Gonseth and Knorpp each a promissory note for $12,015.55. The initial capital stock account entry was "Chas Knorpp 24 sh ($) 2400, Dolores Gonseth 24 sh ($) 2400, Max Patten 2 sh ($) 200." Under date of July 16, 1956, certificate number 1 for 24 shares was issued to Knorpp, certificate number 2 for 24 shares was issued to Gonseth, and Patten was issued certificate number 3 for 2 shares. Each certificate bore the corporate seal, was signed by Knorpp as president and Gonseth as secretary, and was physically delivered to the shareholders. The parties in a gathering at Patten's office had agreed that Gonseth, Knorpp and Patten would constitute the board of directors, that Knorpp would be president, and that Gonseth would be vice president and secretary.

■ Plaintiffs' petition alleges (and we hasten to note averments of a pleading unsupported by proof are unavailing) [1] Gonseth consented to the incorporation "in reliance upon the representations and assurances made by * * * Knorpp * * * this move would not change the partnership relation between the parties, that the parties would be equal owners of the corporation to be formed, and would continue to carry on their business * * * in the same manner as they were then carrying it on as partners. * * * Knorpp explained to * * * Gonseth that issuance of the 2 shares [to] Patten would not give * * * Patten any interest in the corporation [but] were to be issued * * * to qualify [Patten] as one of the three incorporators as then required by law and also to qualify [Patten] as a director of the corporation."

Concerning these allegations, Gonseth testified Knorpp "explained to me what incorporating was, what it meant, and I asked him * * * if it would change our agreement of partnership the way we were doing before, that we would still have the same interest and everything and if Mildred, his wife, would be another party in it, and he said 'No,' it was just him and I, it would be just the same as it was before. *We would each own an equal part in it."* (Our emphasis.) Knorpp, according to Gonseth, told Patten "that he had explained to me that we were equal partners, but that if we incorporated" it was necessary to have three shareholders to act as incorporators but "that it didn't mean that there would be any change, that he [Patten] didn't have any part in the business, that we were still equal partners." Although Gonseth professed to be wholly unfamiliar with corporate matters at the time she agreed to incorporation, she testified with professional knowledge at the trial that "I understood Mr. Patten was just a qualifying shareholder."

Knorpp said Patten was employed to do the legal work in forming the corporation either in Gonseth's presence or with her knowledge, and that he had an agreement with Patten "that he was to get two shares for doing this work for the K and K Oil

---

1. State ex rel. Phelps v. McQueen, Mo. (banc), 296 S.W.2d 85, 90(5); 71 C.J.S. Pleading § 520, pp. 1076–1078.

Company." Patten asseverated he received the two shares in payment of his services, that he "never did take any qualifying shares," and that Gonseth "knew I had two shares of stock, and that two shares means a joint interest in the company." Aside from Gonseth's testimony as to what she "understood," there is no evidence in the record anyone had stated that Patten would be only "a qualifying shareholder." Knorpp vowed that until he had heard the expression used during the trial, "I had never in my life * * * heard about qualifying shares. Mrs. Gonseth in no way could have been told about qualifying shares. I knew nothing in my life about qualifying shares. [It was my understanding] when shares were issued, they were yours forever * * * unless you sold them." It is undisputed that Patten received no money for the legal services he performed, and no testimony was offered to overcome the evidence that a reasonable fee for such services was $200, the value of the two shares when issued to Patten. The parties tacitly agree a corporation may issue stock for "labor done" (V.A.M.S.Const. art. 11, § 7) and "that stock in a business corporation may be paid for by services rendered" (Vogeler v. Punch, 205 Mo. 558, 573, 103 S.W. 1001, 1005).

The gist of Knorpp's testimony regarding pre-incorporation discussions was that he had several conversations with Gonseth concerning the matter, and that the decision to incorporate was mutual as Gonseth had to give her "authority the same as I did. She had as much invested as I did." When asked if anyone explained to Gonseth "that she wasn't going to own half of this [corporation] when this was completed," Knorpp answered, "I did [and I also told her] that we would own equal shares, which we do own equal shares."

After formation of the corporation Knorpp continued to manage and operate the business and consult with Gonseth as he had done previously. There were no meetings held of the shareholders until January 22, 1966, but this omission did not "work a forfeiture or dissolution of the corporation." § 351.225, RSMo 1949 and V.A.M.S., RSMo 1959. Patten took no part in the affairs of the corporation, except in a legal capacity, until January 1966, and was paid no dividends until that time. The corporation prospered, as evidenced by the fact the book value of each share increased from $100 at the time of incorporation to $3,029.72 as of December 31, 1966. Gonseth and Knorpp also fared well personally. Each received a salary, bonuses and dividends. Knorpp's salary as manager increased from $125 to $350 a week between 1956 and 1965 and his gross income from the corporation was $19,200 in 1965. Gonseth's weekly salary as secretary was $75. Before incorporation the rent paid Gonseth on her truck stop was computed only on the amount of fuel sold at the station, but after the corporation was formed she was paid additional rent at the rate of $300 per month. Excluding rent payments, Gonseth's receipts from the corporation averaged $4,378.67 per year between 1957 and 1965.

In March 1962 Knorpp and Gonseth each put $10,000 into the corporation to provide added capital[2] and agreed they would each receive 100 additional shares of stock. Two new certificates were issued: number 1 for 124 shares to "Charles Knorpp and [his wife] Mildred Knorpp," and number 2 for 124 shares to "Dolores Gonseth and [her sister] Frances Gaston, as joint tenants and not as tenants in common." Issuance of the new certificates was not recorded in the capital stock stub record. The assignment forms on the original certificates were never executed and no entry was made in the stock stub record to indicate the original shares had been assigned or transferred to anyone. An accountant subsequently discovered there had been an overissue of stock and changed the cor-

---

2. There is some testimony this occurred in 1959, but as the discrepancy is of no import it will be ignored.

porate books (capital account) to show capital stock issued was $5,000 (instead of $25,000, which was not authorized) and paid in surplus was $20,000.

The placid seas on which the corporation sailed developed swells in late 1965. Without recounting details, Knorpp asked Gonseth to remodel the truck stop which she owned, with the assurance the rent would be increased if she would do so. When Gonseth refused, the $300 additional rent the corporation had been paying her was stopped January 1, 1966, and Gonseth cancelled the corporation's lease a month or two before the case was tried in July 1967. Also, in December 1965 Knorpp offered to buy Gonseth's interest in the corporation for $75,000, but the offer was refused. Gonseth subsequently agreed to sell to a third person for $75,000 on the understanding Knorpp was selling his interest for a like amount. This deal, too, came to naught, and there is a suggestion Gonseth refused to consummate the sale because Knorpp would not sign an agreement to retire from the oil business in the area.

On January 18, 1966, Knorpp, as president of the corporation, sent Gonseth a registered letter advising a special meeting of stockholders would be held in Patten's office on January 22, 1966. Gonseth attended the meeting along with Knorpp and Patten, and the minutes disclose the three of them were elected directors and, at the directors' meeting which followed, Knorpp was elected president and Mildred Knorpp was elected vice president and secretary. Gonseth said, "I didn't vote," but asserted her objection when Knorpp said he wanted his salary raised to $500 a week and then "Mr. Patten seconded the motion, and so that was the end of the meeting." Immediately following the meeting Gonseth offered to sell her interest to Knorpp for $100,000, but "he [said he] couldn't get that

much money together." A few days later Knorpp offered his interest to Gonseth for $75,000 but later withdrew the offer "because of his tax situation." Although notified of the February 25, 1967, shareholders' meeting, Gonseth did not attend; neither has she cashed two checks for $480 each sent in payment of 1965 and 1966 dividends because, as she pleaded, they were issued "by the defendants with the hope that the plaintiffs would cash the checks and thereby estop themselves from attacking the validity of the purported corporation meetings and the claim of * * Patten to be one of the owners of the defendant corporation." No salary was paid Mildred Knorpp as secretary of the corporation after she was elected to that office. The trial court found that Gonseth "has not shown that the acts ousting her from office, setting salaries and so forth by Patten and Knorpp were fraudulent * * * nor have they been detrimental to the corporation since the books show that the corporation has prospered. * * * no fraud was present in the formation of the corporation."

One concern we have is with the involvement of Frances Gaston in this suit who sues individually and as a stockholder. She was named as a joint tenant with Gonseth on the certificate purporting to represent 124 shares in the corporation. This admittedly was an overissue. Although there is near famine in the reported cases on the proposition, it seems generally agreed by the sparse authority there is that since the power of a corporation to issue stock is limited to the amount authorized by its articles of incorporation, any stock issued in excess of that limit is ultra vires and void. Also, any overissued stock is not stock and a holder of such unauthorized shares cannot, by estoppel or otherwise, become a stockholder.[3] If the

3. St. Thomas Jewelry, Inc. v. Commissioner of Finance, D.C.V.I., 255 F.Supp. 461, 462(1, 2); Taylor v. Lounsbury-Soule Co., 106 Conn. 41, 137 A. 159, 163 (7); Garnett v. State ex rel. Bank Commissioner, 162 Okl. 195, 19 P.2d 375, 380(2), and the three companion cases which follow; 18 Am.Jur.2d, Corporations, § 230, pp. 757–758; 18 C.J.S. Corporations § 209, p. 643.

cited authorities are correct, Mrs. Gaston is not a shareholder in the corporation. There is nothing in the record to demonstrate that she, as an individual, has any business in the fray. No relief is sought on her behalf, she did not testify, and her name is forgotten in Gonseth's prayers to this court. The same may be said of defendant Mildred Knorpp, except she is now an officer of the corporation. Our decision makes it unnecessary for us to determine directly who are and who are not necessary and proper parties to this cause. However, Mrs. Gaston has wholly failed to prove entitlement to any equitable relief at our hands.

The hodgepodge of specific prayers collected in the amended petition suggested that plaintiffs had embarked upon dual missions to champion the right of the corporation in a derivative capacity and also to redress alleged wrongs done Gonseth individually. Nigh all the particular askings have been forsaken on appeal because Gonseth alone proclaims "she is entitled, under the prayer for general relief in her amended petition, to any equitable relief consistent with" the facts which show "Gonseth is rightfully the owner of a one-half interest in the corporation," and that we should dispatch the corporation by liquidation and insure distribution of at least one-half its net assets to Gonseth. If we have misconceived Gonseth's entire aim, censure should not be too severe for she has fired a scatter shot to wing her game from different directions and for divergent unspecified reasons.

Gonseth has studiously avoided the use of the word fraud in her pleadings and brief, and if the term appears in either it has escaped our search. Nonetheless, one pellet in her charge seemed marked for fraud, that is, fraud in procuring her consent to the incorporation of the business. This was also the apparent belief of the trial chancellor.

■■■ It is fundamental that the burden of proof rests upon the party asserting fraud [Smile v. Lawson, Mo. (banc), 435 S.W.2d 325, 328(2); Shepherd v. Woodson, Mo., 328 S.W.2d 1, 6(1)], that fraud is never presumed, that it cannot be proved by inference, and the creation of a mere inference of fraud does not meet the burden of proof cast upon the party alleging it. Swager v. Vogt, Mo.App., 435 S.W.2d 49, 51(3). As fraud imputes venality and corruption to the person charged with it, both reason and law require that it be established by clear and convincing proof. Gibson v. Smith, Mo., 422 S.W.2d 321, 327–328(7).

■■■ At the conclusion of the trial the chancellor was confronted with the usual and sometimes difficult problem of deciding upon the believability of conflicting evidence and the weight and value to be afforded Gonseth's testimony in discharging her burden to clearly and convincingly prove she had been induced to agree to incorporation as the result of actionable fraud. Her testimony was that although Knorpp "explained to me what incorporating was, what it meant," and had told her the act of incorporating would not change anything, Patten (although he was to have two shares of stock and be a member of the board of directors) "didn't have any part in the business" and after the corporation was formed "we would each own an equal part in it." Of course, this latter assertion was perfectly true, and for it to constitute a false representation the fact trier would be required to either interpret or interpolate into that statement the representation that Gonseth was to become the owner of a one-half interest in the corporation even though she fully understood she was to own but 24 of the 50 authorized shares to be issued. To the contrary, Knorpp said he told Gonseth "she wasn't going to own half of this" corporation, and Patten asserted that Gonseth "knew I had two shares of stock, and that two shares means a joint interest in the company." The meaning of Gonseth's *understanding* that "Patten was just a qualifying shareholder" was never explain-

ed and our research has not unearthed a judicial definition of the term. An accountant who testified in the case opined that "qualifying shares" meant shares "qualifying to meet the statutory requirements of stockholders, the number of stockholders," or "shares issued to a party other than the party that furnishes the consideration." At best, this is a nebulous definition, and apparently the inference Gonseth desired to be drawn from what she "understood" was that Patten would remain a shareholder only so long as it took to incorporate the business and that when the incorporation procedure had been completed he would cease to exist in that capacity. Usually one's understanding about a matter is not competent evidence [Cox v. McKinney, 212 Mo.App. 522, 530, 258 S.W. 445, 447–448(8)], and this also overlooks the requirement in the articles of incorporation (which Gonseth signed and acknowledged) that there had to be three directors and each had to be a stockholder. If Patten had not been a stockholder he could not have been a director, a position Patten held for more than ten years without objection and with Gonseth's full knowledge. There is no evidence that Patten or Knorpp understood and agreed Patten was to be a mere qualifying shareholder, their testimony directly contradicts what Gonseth said she "understood," and Gonseth's professed ignorance of corporate matters at the time of incorporation would tend to cause a trial judge to suspect the accuracy of her testimony regarding her understanding. Under these circumstances, if the trial court elected to disbelieve Gonseth's testimony in preference to that of Patten and Knorpp, or believed that Gonseth had failed in proving fraud by clear and convincing proof, we cannot say its choice and its conclusions on disputed testimony are clearly erroneous.

The essential elements of actionable fraud are (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury,[4] and the failure to establish any one of these essential elements is fatal to recovery.[5] As previously noted, Gonseth alleged in the petition and has asserted in her brief she consented to the incorporation in reliance upon Knorpp's statements, agreements annd assurances. However, pleadings do not prove themselves [School Dist. No. 80 of Christian County v. School Dist. No. R-1 of Christian County, Mo.App., 258 S.W.2d 258, 259(1); Rust Sash & Door Co. v. Bryant, Mo.App., 124 S.W.2d 544, 547(4)] and proof cannot be bottomed on statements printed in an appellant's brief.[6] We have unsuccessfully seined the transcript on appeal in an effort to find any testimony on Gonseth's part that she relied upon the truth of anything which either Knorpp or Patten may have told her to induce her to agree to incorporating the business. She was not asked, and nowhere stated she relied upon the inferential statement of Knorpp that she would own one-half of the corporation, or upon the alleged representations of Knorpp and Patten that the attorney "didn't have any part in the business." Consequently, even if we allow that Gonseth established

4. Ackmann v. Keeney-Toelle Real Estate Company, Mo. (banc), 401 S.W.2d 483, 488(4); Yerington v. Riss, Mo., 374 S.W.2d 52, 57(2); Beshears v. S-H-S Motor Sales Corporation, Mo.App., 433 S.W.2d 66, 70(2); 37 C.J.S. Fraud § 3, pp. 215–218.

5. Powers v. Shore, Mo. (banc), 248 S.W. 2d 1, 5(2); Dolan v. Rabenberg, 360 Mo. 858, 865, 231 S.W.2d 150, 154(3);

Salmon v. Brookshire, Mo.App., 301 S.W. 2d 48, 54(5); Hanson v. Acceptance Finance Co., Mo.App., 270 S.W.2d 143, 149(2).

6. Landers v. Smith, Mo.App., 379 S.W.2d 884, 887(4); In re Jackson's Will, Mo. App., 294 S.W.2d 953(1); E. C. Robinson Lumber Co. v. Lowrey, Mo.App., 276 S.W.2d 636, 644(21).

by clear and convincing proof eight of the nine essential elements of actionable fraud, supra, we are confronted, as was the trial chancellor, with a total dearth of any proof that Gonseth at any time relied upon the representations made to her by Knorpp and Patten regarding incorporation or the consequences thereof.

■■■■ Gonseth, upon the assumption she had proved her right to the ownership of one-half the corporation, urges that one way to accomplish this is by cancelling the two shares of stock issued to Patten. Ignoring the question of whether Gonseth, as a stockholder, has any right to maintain an action for that purpose, the issuance of stock to Patten in payment of his services cannot, in the absence of fraud, be questioned by a stockholder. Vogeler v. Punch, supra, 205 Mo. at 577–578, 103 S.W. at 1006(4). Gonseth's charges of fraud are leveled against the representations which induced her to agree to incorporate, not against the issuance, per se, of the shares to Patten. The favorite maxim of equity is that he who seeks equity must do equity, and a party seeking equity will not be heard if he asks benefits which can only be bestowed by doing inequity to an innocent party. 30 C.J.S. Equity § 91 a, pp. 988–993.

■■■■ Another path pursued by Gonseth relates to "the agreement" Knorpp made with her that incorporation would not alter the ownership, control or management of the business from that enjoyed by them as partners. If we should perceive any part of this action as an attempt on Gonseth's part to enforce a contract which purports to vest the control, ownership and management of a corporation in individuals contrary to law, then the cause must fail, for the law must prevail over any agreement made in violation of the law. Prima facie, the owner of stock has a voting right as an incident of such ownership [Christmas v. Kennedy, 129 Pa. Super. 80, 194 A. 773, 776(2)], and both

RSMo 1949 and V.A.M.S., RSMo 1959 provide the shares owned by a stockholder determine his units of right to participate in the control of the corporation (§ 351.015), that each outstanding share shall be entitled to vote at a meeting of shareholders (§ 351.245), and that "the property and business of a corporation shall be controlled and managed by a board of directors" (§ 351.310). An agreement will not be enforced or be permitted to form the basis for another type of action which assumes to change the right of a shareholder to participate in the control of the corporation, or which undertakes to divest the board of directors of management of the property and business of a corporation or deprive the directors of the right to elect officers. A partnership may not disguise itself as a corporation and any agreement purporting to do so is, generally speaking, void. E. K. Buck Retail Stores v. Harkert, 157 Neb. 867, 62 N.W.2d 288, 299, 45 A.L.R.2d 774; Haldeman v. Haldeman, 176 Ky. 635, 197 S.W. 376, 380–381(6).

V.A.M.S. § 351.485, RSMo 1959 empowers courts of equity, upon the suit of a shareholder, to liquidate the assets and business of a corporation "when it is made to appear: (a) That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or (b) That the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent; or (c) That the corporate assets are being misapplied or wasted."

■■■■ The granting or refusal by a court to liquidate the assets and business of a corporation is, in the first instance, a matter of discretion for the trial court, and we are not to substitute our discretion for that of the trial chancellor in the absence of a showing that he abused such discretion. Kessler v. United Agencies, Mo.

App., 243 S.W.2d 779, 780; Maxwell v. Enterprise Wall Paper Mfg. Co., 3d Cir., 131 F.2d 400, 403(6). Courts should proceed with extreme caution in liquidating corporations and should resort to such a procedure only to prevent irreparable injury and, ordinarily, only in cases of imminent danger of loss or of miscarriage of justice; "neither bad judgment nor past acts or derelictions of directors would alone authorize such relief." Handlan v. Handlan, 360 Mo. 1150, 1166, 232 S.W.2d 944, 950–951(3).

Gonseth's claim the directors are deadlocked is premised solely upon the assertion that she and Knorpp are the only stockholders and hence the only directors of the corporation. This premise has already been held to be nonexistent. She has not proved, which is her burden [Long v. Norwood Hills Corporation, Mo.App., 380 S.W.2d 451, 470(2)], that irreparable injury to the corporation has resulted from or is threatened by reason of any action taken or contemplated by the board of directors or officers of the corporation. To the contrary, and as found by the trial court, "the books show that the corporation has prospered" during all the time of its existence. The actions to which Gonseth objects—being deprived of her weekly salary as secretary and reduction in the rent she received—are matters which affected her personally, not matters which have injured the corporation. She has not undertaken to suggest, let alone prove, any fraudulent, oppressive or illegal acts on the part of the directors of the corporation. As previously observed, her allegations and proof as to fraud (which failed) were directed at the formation of the corporation and not as to what subsequently transpired. We cannot detect wherein the trial court abused its discretion or clearly erred in its conclusions and selections as between conflicting testimony. Therefore, the judgment of the trial court is accordingly affirmed.

HOGAN, P. J., and STONE, J., concur.