Steven J. **HOOPER**, Petitioner,

v.

David **YODER**, Respondent.

No. 85SC38.

Supreme Court of Colorado,
En Banc.

May 26, 1987.

---

1. *See* cases cited by the majority at 849, note 6.

Nelson & Harding, John S. Finn, Denver, for petitioner.

Buchanan, Gray, Purvis & Schuetze, John A. Purvis, William R. Gray, Boulder, for respondent.

LOHR, Justice.

This case presents issues concerning the incorporation of a business previously conducted as a partnership, and the effect of such incorporation on the rights and obligations of the partners with respect to each other. The plaintiff, David Yoder, and the defendant, Steven Hooper, formed a partnership for the manufacture and sale of frozen yogurt bars. Subsequently, they incorporated that business. After disputes arose between the parties, Yoder sought recovery from Hooper in Boulder County District Court, contending that Hooper had breached a fiduciary duty by causing corporate stock to be issued to himself but not to Yoder, and in drawing a salary from the business without the assent or knowledge of Yoder. After a non-jury trial, the district court agreed with Yoder, directed Hooper to transfer one-half of his stock in the corporation to Yoder, and entered judgment in favor of Yoder and against Hooper in the amount of one-half of the salary Hooper had received from the business. On appeal, the Colorado Court of Appeals affirmed. *Yoder v. Hooper*, 695 P.2d 1182 (Colo.App.1984). We granted certiorari and now affirm the judgment of the court of appeals. Our reasoning, however, differs from that of the court of appeals in some respects.

## I.

In the fall of 1976, defendant Steven Hooper, a businessman, initiated several meetings with plaintiff David Yoder to discuss business opportunities in the dairy products field. Yoder had experience in that industry, but Hooper had none. After a series of meetings, Yoder and Hooper agreed to work together to develop and market a novelty dairy product, frozen yogurt bars. Yoder testified that they agreed to share equally in the financial risks, the work load and the potential profits of the business. Hooper's contribution was to be his business acumen and Yoder was to contribute his knowledge of the dairy industry. A third individual supplied the initial working capital in consideration of an agreement by Hooper and Yoder to pay that person a commission on sales of frozen yogurt bars. Although Hooper and Yoder agreed upon their respective roles in the business venture, no formal written partnership agreement was drawn. After reaching agreement, both devoted their efforts to the enterprise.

Hooper and Yoder began discussing the possibility of incorporating their business in the early spring of 1977, which corresponded with the time their product was ready to market. After the two parties had consulted several lawyers, both in Colorado and in California where the yogurt bars were being produced, they incorporated their business in California under the name of Beautiful Daydreams, Inc. (Beautiful Daydreams). Hooper became president

and treasurer of the corporation and Yoder was named vice-president and secretary. The two men were the only members of the board of directors. They decided to defer the issuance of stock in the corporation.

In May of 1977, Hooper moved to southern California in order to oversee the production and distribution of the frozen yogurt bars. By September of 1978, Hooper had taken over the responsibility of purchasing, shipping, invoicing, and sales in California, while Yoder was responsible for merchandising, distribution, and sales in the Denver area. Yoder worked closely with Market West Brokers (Market West), a Denver-based food brokerage firm engaged by Beautiful Daydreams to help market its product. Yoder and Hooper kept in close contact, talking to each other on the telephone at least daily and sometimes several times a day. Yoder made several trips to California and believed that his business relationship with Hooper was running smoothly.

Market West loaned money to Beautiful Daydreams to alleviate a cash flow problem, and when Beautiful Daydreams was unable to repay the loan promptly, Market West agreed to accept stock in the corporation in partial payment of the debt. In October of 1978, Hooper and Yoder named Brian Bradley, who was Beautiful Daydreams' principal contact at Market West, as an additional member of the board of directors. Market West initiated Bradley's election in order to protect its financial investment in Beautiful Daydreams.

Starting in October of 1978, Yoder began to have difficulty keeping in contact with Hooper. On November 1, 1978, Yoder received a message from Hooper informing him that Hooper had scheduled a meeting of the board of directors of Beautiful Daydreams in Denver for the following week. Yoder immediately attempted to contact Hooper to remind him that Yoder had long-standing plans to attend a business convention in California during the time that the board of directors was scheduled to meet. Yoder was unable to reach Hooper, and Hooper did not return Yoder's calls. After discussing the scheduling conflict with Bradley, Yoder went to the convention in California and did not attend the board meeting. At the meeting and without Yoder's knowledge, the other two directors adopted a resolution for issuance of 100 shares of stock, 95 to Hooper and 5 to Market West in exchange for cancellation of $9500 of the corporation's indebtedness to Hooper and $500 of its indebtedness to Market West.[1]

When Yoder returned from California, he repeatedly tried to reach Hooper, without success. By this time, Hooper had not communicated with Yoder in more than a month. Yoder then flew to California and on November 14, 1978, appeared at a meeting that Hooper had arranged with Bradley and some distributors in San Francisco. After the meeting, the three board members discussed the financial condition of the company. Hooper and Bradley told Yoder that Market West would be taking reduced compensation, that Hooper and Yoder would not be receiving salary, and that no more money would be taken out of the corporation. Hooper testified that Yoder's involvement in the business was terminated at the San Francisco meeting when Hooper told Yoder that Yoder would have to seek another job because Beautiful Daydreams had run out of funds. Yoder, however, testified that he understood the conversation to mean that no one would be able to take money out of the business until it started to generate more income. Yoder expressed to Hooper his frustration at not being kept informed and not being able to help with the business into which he had poured so much of his time and energy.

---

1. In August of 1977, Hooper and Yoder each advanced $10,000 to the corporation to alleviate its cash flow difficulties. The corporation retired its debt to Yoder through periodic payments. No payments were made to Hooper. According to the minutes of the "Special Meeting of Board of Directors" held on November 11, 1978, Hooper agreed to cancel Beautiful Daydreams' debt to him in consideration of 95 shares of stock, valued at $100 per share. The remaining $500, however, continued to appear on the corporation's financial statement of November 30, 1978, under "Loans Payable" and was listed as being due on demand.

Yoder and Hooper met once again on November 15, 1978, at the airport immediately prior to Yoder's flight back to Colorado. Yoder testified that at that meeting Hooper was much more cooperative. According to Yoder, the men discussed the need to get part-time jobs and to work on the company's problems. Hooper discouraged Yoder from moving to California when Yoder expressed such an inclination. Yoder testified that at no time did the men discuss a decision to terminate Yoder's employment permanently, nor did Hooper or Bradley mention that a resolution had been adopted for the issuance of 100 shares of stock in Beautiful Daydreams.

On January 15, 1979, by written "Action of Shareholders Without a Meeting," Hooper and Market West, acting through Bradley, removed the entire board of directors of Beautiful Daydreams and elected Hooper and Bradley as the only directors. On that same day these two directors met and elected Hooper as president and treasurer and Bradley as vice president and secretary. Yoder received no advance notice of the meetings or of the nature of the corporate action to be considered on January 15.

After returning to Colorado from the San Francisco meeting in November, Yoder was again unable to reach Hooper by telephone. Yoder then became concerned that he had never seen Beautiful Daydreams' organizational records. On January 19, 1979, he called the California attorney who had helped with the incorporation of the business, and requested a copy of the corporate records.

On February 1, 1979, Yoder received a mailgram from Hooper stating, "For reasons Brian and I discussed with you at our meeting in November we must permanently lay you off. Letter will follow." Yoder again attempted to contact Hooper, without success. Yoder received a letter from Hooper on February 8, 1979, detailing the reasons that his employment had been terminated. On March 16, Yoder received from the California lawyer copies of the minutes of Beautiful Daydreams' board meetings. It was at this time that Yoder first became aware that corporate stock had been issued to Hooper and Market West, and that Yoder was no longer an officer or director of Beautiful Daydreams. Yoder did not learn of the fact that Hooper was receiving a salary from the business, totaling $141,500 for the years beginning in 1978 and continuing into 1982, until much later.

In August of 1979, Yoder filed the present action against Hooper and Beautiful Daydreams in the District Court for Boulder County. In March of 1982 the trial court heard the case without a jury and made the following oral findings of fact and conclusions of law: (1) a partnership was formed between Hooper and Yoder prior to May of 1977 for the purpose of manufacturing and selling frozen yogurt bars; (2) the parties agreed to continue their partnership enterprise in corporate form; (3) the essential term of the agreement, for the purpose of the present dispute, was that in the event stock were to be issued, it would be issued in equal amounts to Hooper and Yoder; and (4) Hooper breached the agreement and his fiduciary duty by not causing half of Hooper's 95 shares of stock to be issued to Yoder in November 1978, "by freezing him out of the corporation after January 15, 1979 and by drawing a salary for [Hooper]." The trial court also found that Hooper had received $141,500 in salary prior to the time of trial. The court concluded that Hooper should be deemed to hold one-half of the $141,500 salary payments and one-half of the 95 shares of stock in constructive trust for Yoder. It then entered judgment in favor of Yoder for $70,750, and ordered Hooper to transfer 47½ shares of stock in Beautiful Daydreams to Yoder.[2] The court dismissed the complaint against Beautiful Daydreams.

Hooper appealed, and the court of appeals affirmed the judgment. Hooper then

2. At the conclusion of the trial court's oral ruling, counsel for Hooper asked whether Yoder would be required to pay any amount for transfer of the 47½ shares of stock. The court declined to impose such a requirement. The propriety of this ruling is not before us in this certiorari review.

petitioned this court for a writ of certiorari, and we granted that petition.

We conclude that the partnership was dissolved upon the formation of Beautiful Daydreams but that the partnership did not terminate at that time. Instead, the partnership continued in existence for the purpose of winding up. Hooper breached his fiduciary duty to his partner, Yoder, during the course of the winding-up process by excluding Yoder from participating equally in the issuance of corporate stock and by withdrawing salary from the business without the assent or knowledge of Yoder. We also conclude that the relief fashioned by the trial court and affirmed by the court of appeals was appropriate to remedy the breaches of fiduciary duty by Hooper.[3]

## II.

It is Hooper's position that the partnership between him and Yoder terminated on the date of incorporation of Beautiful Daydreams. Hooper asserts that the corporation's activities, including the issuance of the stock and the payment of salary to Hooper, were conducted in a manner fully consistent with corporate law. Therefore, Hooper contends, the trial court erred in concluding that Hooper breached a fiduciary duty to Yoder and in granting Yoder relief of any kind. Hooper goes on to argue that even if the partnership continued after formation of the corporation, he was entitled to the contested salary as compensation for services performed during

the period of winding up the partnership. We do not agree with Hooper's analysis.

## A.

█ The parties do not dispute the conclusion of the district court that Hooper and Yoder formed a partnership for the purpose of manufacturing and selling frozen yogurt bars, and the record fully supports the court's conclusion. Colorado has adopted the Uniform Partnership Law, §§ 7–60–101 to –143, 3A C.R.S. (1986). Under that legislation, a partnership is defined as "an association of two or more persons to carry on, as coowners, a business for profit." § 7–60–106(1), 3A C.R.S. (1986). See Grau v. Mitchell, 156 Colo. 111, 397 P.2d 488 (1964); Thompson v. McCormick, 149 Colo. 465, 370 P.2d 442 (1962); Roberts v. Roberts, 113 Colo. 128, 155 P.2d 155 (1945). The trial court found that in the fall of 1976, the parties agreed to engage in the business of manufacturing and selling frozen yogurt bars for the purpose of making a profit. The court found that they agreed to put their money or credit, labor and skills into the enterprise and agreed to share equally in the profits and losses, and in any funds available for salaries. The record contains ample evidence to support these findings, which in turn support the conclusion that Hooper and Yoder entered into a partnership to engage in the frozen yogurt bar business. See Grau v. Mitchell, 156 Colo. 111, 397 P.2d 488.[4]

---

**3.** We granted certiorari to review the following two issues:

  (1) Whether Hooper and Yoder's pre-incorporation partnership agreement survived the formation of the corporation.

  (2) Whether the partnership pursued a "particular undertaking," as that term is used in section 7–60–131(1)(a)(II), 3 C.R.S. (1984 Supp.)—when the partnership carried on a business, through the instrumentality of a corporation, for the manufacture and sale of frozen yogurt products—preventing one partner from unilaterally causing the dissolution of the partnership.

Upon review of the record, however, we conclude that the second issue is not presented in this case. The partnership was dissolved by a mutual agreement to incorporate rather than by the unilateral action of one partner. We do not agree with the analysis of the court of appeals

that this case factually presents an issue of attempted unilateral termination of the partnership by Hooper. See Yoder v. Hooper, 695 P.2d at 1187–88.

**4.** The trial court's ruling does not clearly state whether the enterprise was a partnership or a joint venture. A joint venture is a partnership formed for a limited purpose. A. Bromberg & J. Crane, Law of Partnership § 35 (1968). See also Crest Constr. Co. v. Insurance Co. of North America, 417 F.Supp. 564 (W.D.Okla.1976); Travis v. St. John, 176 Conn. 69, 404 A.2d 885 (1978). Joint venture is often defined as "[a]n association of two or more persons to carry out a single business enterprise for profit." 2 S. Rowley, Partnership § 52.2 (2d ed. 1960). The distinction made no difference for the purposes of the trial court's analysis, nor does it for ours. The substantive law of partnership applies to

### B.

The record also establishes without contradiction that the decision to incorporate was mutual. Both parties discussed the possibility of incorporating their business, consulted lawyers in both Colorado and California with respect to incorporation, and upon incorporation, elected themselves as the only members of the board of directors and the only officers of the corporation.

■ As a general rule, when partners organize a corporation to operate the business of the partnership and transfer the assets to the corporation, the partnership is dissolved. 2 S. Rowley, *Partnership* § 58.-11 (2d ed. 1960). This is so because such action usually reflects the express will of the parties that the partnership be dissolved. *See id.;* § 7–60–131(1)(a)(III), 3A C.R.S. (1986).[5]

■ The trial court's finding that the parties agreed "to continue their partnership in corporate form" is subject to more than one interpretation. It can be read as a finding that the partnership would survive the incorporation and that the corporation would simply be a vehicle for conducting the business of a continuing partnership. *See, e.g., Jolin v. Oster*, 44 Wis.2d

623, 172 N.W.2d 12 (1970) (corporation can be used as a means of conducting business of joint venture where intentions of parties are clearly expressed). *But see, e.g., Weisman v. Awnair Corporation of America*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957) (the existence of a corporation by definition excludes the existence of a partnership). On the other hand, it can be construed as a finding that the business of the partnership enterprise would continue but that it would be organized as a corporation rather than as a partnership. We find no support in the record for a finding that the parties intended that the partnership would continue after the corporation was organized. As the trial court found, the partners agreed to incorporate, and the essential term of that agreement was that stock ownership would be equal. Based on this record, we conclude that the partnership between Hooper and Yoder was dissolved upon the incorporation of Beautiful Daydreams.

### C.

■ The dissolution of a partnership, however, does not automatically terminate the existence of the partnership. The Uniform Partnership Law provides that "[o]n dissolution the partnership is not terminat-

joint ventures as well as partnerships. *See Singer Housing Co. v. Seven Lakes Venture*, 466 F.Supp. 369 (D.Colo.1979); *Stone-Fox, Inc. v. Vandehey Development Co.*, 290 Or. 779, 626 P.2d 1365 (1981); *Madrid v. Norton*, 596 P.2d 1108 (Wyo.1979); 2 S. Rowley, *Partnership* § 52.1 (2d ed. 1960). Partners as well as joint venturers are fiduciaries with respect to each other and owe to each other the highest duty of loyalty. *Lindsay v. Marcus*, 137 Colo. 336, 325 P.2d 267 (1958).

5. § 7–60–131(1), 3A C.R.S. (1986), provides, in pertinent part:

(1) Dissolution is caused:

(a) Without violation of the agreement between the partners:

(III) By the express will of all the partners who have not assigned their interests or allowed them to be charged for their separate debts either before or after the termination of

any specified term or particular undertaking;
The general rule that incorporation of a partnership business effects dissolution of the partnership is set forth in numerous cases. *See, e.g.,*

*Francklyn v. Sprague*, 121 U.S. 215, 7 S.Ct. 951, 30 L.Ed. 936 (1887) (incorporation by members of a partnership for the purpose of continuing the business formerly conducted by the partnership extinguishes the equities that the former partners had in the partnership property and leaves them in the position of shareholders); *Cavasso v. Downey*, 188 P. 594 (Cal.App.1920) (where partners incorporated a partnership business, and there was no evidence of an agreement that their relationship as co-partners should continue, the partnership was terminated and merged into the corporation); *Gonseth v. K & K Oil Co.*, 439 S.W.2d 18 (Mo.App.1969) (upon transfer of partnership assets to corporation, partnership ceased to exist); *Sun River Stock & Land Co. v. Montana Trust & Savings Bank*, 81 Mont. 222, 262 P. 1039 (1928) (if partners adopt the corporate form with the corporate shield extended over them, they cease to be partners and have only the rights, duties, and obligations of stockholders); *Weisman v. Awnair Corporation of America*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957) (the existence of a corporation by definition excludes the existence of a partnership).

ed but continues until the winding up of partnership affairs is completed." § 7–60–130, 3A C.R.S. (1986). *See also Schoeller v. Schoeller,* 497 S.W.2d 860 (Mo.App. 1973); *Bader v. Cox,* 701 S.W.2d 677 (Tex. App.1985); *Lange v. Bartlett,* 121 Wis.2d 599, 360 N.W.2d 702 (Wis.App.1984). "The winding up includes the entire process of settling the partnership affairs after dissolution." 1 S. Rowley, *Partnership* § 37.0 (2d ed. 1960). *See also* A. Bromberg & J. Crane, *Law of Partnership* § 73 (1968).

When partners organize a corporation to continue the business of the firm, the winding up of the partnership includes the transfer of the partnership assets to the corporation in exchange for corporate stock. *See generally, Gonseth v. K & K Oil Co.,* 439 S.W.2d 18 (Mo.App.1968); 1 S. Rowley, *Partnership* § 31.1; 2 S. Rowley, *Partnership* § 58.11. Here, the winding up of the partnership remained incomplete pending issuance of corporate stock to Hooper and Yoder in equal amounts pursuant to the agreement they made as partners prior to incorporation.[6] Because there were no shares of stock issued upon incorporation of Beautiful Daydreams, it cannot be said that the property of the partnership was exchanged for stock in the corporation and that the stock was then distributed to the partners, thereby winding up the partnership affairs. The circumstances of this case bring us to the conclusion that the winding up of the partnership was not accomplished upon incorporation and, therefore, the partnership continued to exist.

### D.

Because the partnership continued to exist, so did the fiduciary duties that one partner owes to another. Partners in a business enterprise owe to one another the highest duty of loyalty; they stand in a relationship of trust and confidence to each other and are bound by standards of good conduct and square dealing. *See Lindsay v. Marcus,* 137 Colo. 336, 342–43, 325 P.2d 267, 270–71 (1958) (involving joint venturers; fiduciary duties are same as those among partners); *Kincaid v. Miller,* 129 Colo. 552, 563, 272 P.2d 276, 281 (1954) (same); *Jennings v. Rickard,* 10 Colo. 395, 397, 15 P. 677, 678 (1887). *Cf.* § 7–60–121(1), 3A C.R.S. (1986).[7] Each partner has the right to demand and expect from the other a full, fair, open and honest disclosure of everything affecting the relationship. *See Lindsay v. Marcus,* 137 Colo. 336, 325 P.2d 267; *Kincaid v. Miller,* 129 Colo. 552, 272 P.2d 276; *Jennings v. Rickard,* 10 Colo. 395, 15 P. 677. During the winding up of partnership affairs, the partners continue to owe to each other the same duty of loyalty and fair dealing. *See Schoeller v. Schoeller,* 497 S.W.2d 860, 868 (Mo.App.1973) (during the period of continuance of partnership business following its dissolution, partners continue to occupy the position of fiduciaries); *Bader v. Cox,* 701 S.W.2d 677, 682 (Tex.App.1985) (partners owe a fiduciary duty to each other in winding up partnership affairs).

As the trial court found, Hooper and Yoder initially agreed that partnership profits and losses would be shared equally, as would any funds available for salaries. When they formed the corporation, the "essential term of the agreement" to incorporate was that any stock to be issued to these incorporators would be shared equally. The fiduciary duty of partners to exercise good faith and loyalty, which continued during the winding up of the partnership, required scrupulous adherence to the parties' agreement in winding up the affairs of the partnership as well as full and honest disclosure of everything affecting the relationship. Hooper's actions in causing the issuance of 95 shares of stock to him-

---

**6.** Neither party contends that the issuance of 5 shares of stock to Market West was improper or that the total number of shares that should have been issued was other than 100. Therefore, the question is how the 95 shares should have been divided between Hooper and Yoder.

**7.** § 7–60–121(1), 3A C.R.S. (1986), provides:

(1) Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

self and none to Yoder and in drawing a salary from the business without the assent or knowledge of Yoder are the very antithesis of the type of fair dealing required between partners in winding up a partnership. The trial court's conclusion that "Mr. Hooper breached his fiduciary duty by not issuing fifty percent of the shares of stock to Mr. Yoder in November of 1978 and by freezing him out of the corporation after January 15, 1979 and by drawing a salary for himself" is factually supported by the record and is legally correct.

Hooper urges, however, that his conduct was proper because all the correct procedures were followed in giving notice and conducting the corporate meetings at which the stock was issued and Yoder's participation in the business was terminated. Hooper observes that Yoder had notice of the November 1978 meeting and chose not to attend. Therefore, Hooper maintains, Yoder cannot complain of any action taken at the meeting, including the issuance of the stock. Similarly, the argument proceeds, since Yoder was not a shareholder at the time of the January 1979 meeting, Yoder was not entitled to notice of the shareholders meeting and cannot complain of his ouster as a director by action of the two shareholders or of his termination as an officer by action of Hooper and Bradley as the sole directors. This entire line of reasoning elevates form over substance. What Hooper's argument ignores is that throughout the course of events the partnership was in the process of winding up, that Hooper owed a fiduciary duty to his partner Yoder, and that the action purportedly taken by the corporation through Hooper's efforts was in violation of Hooper's fiduciary duties of good faith and fair dealing in winding up the partnership affairs in accordance with the parties' prior agreement.

### E.

▮ Hooper also argues that even if the partnership continued in existence subsequent to the incorporation of Beautiful Daydreams, he was entitled to a reasonable salary in managing the partnership business during the course of winding up the partnership affairs. However, Hooper not only did not obtain Yoder's consent to this payment, he did not even inform Yoder that he was taking salary payments from the business while the partnership was being wound up. Moreover, he improperly prevented Yoder from participating in the corporate decision-making process by excluding him from stock ownership and thereby preventing him from receiving notices and participating at shareholders meetings. Under these circumstances, Hooper violated his fiduciary duty to Yoder by taking the salary payments.

▮ Under ordinary circumstances, and in absence of agreement, a partner is not entitled to salary or other compensation for services in conducting the partnership business. *Peck v. Alexander*, 40 Colo. 392, 91 P. 38 (1907); § 7–60–118(1)(f), 3A C.R.S. (1986) (no partner is entitled to remuneration for acting in the partnership business). *See Schoeller v. Schoeller*, 497 S.W.2d 860, 869 (Mo.App.1973); *Rosen Trust v. Rosen*, 53 A.D.2d 342, 386 N.Y.S.2d 491, 498 (1976); A. Bromberg & J. Crane, *Law of Partnership* § 65(e) (1968). This is true even if the services rendered by one partner are disproportionately valuable to any services performed by the others. A. Bromberg & J. Crane, *Law of Partnership* § 65(e); 1 S. Rowley, *Partnership* § 18(f); *Rosen Trust v. Rosen*, 53 A.D.2d 342, 386 N.Y.S.2d 491, 498 (1976) (mere fact that one partner's services were extraordinary does not justify compensation). However, the Uniform Partnership Law does recognize a surviving partner's right to "reasonable compensation" for those services necessary to the winding up of partnership affairs after its dissolution. § 7–60–118(1)(f), 3A C.R.S. (1986). *See Busick v. Stoetzl*, 264 Cal.App.2d 736, 70 Cal.Rptr. 581 (1968); *Schoeller v. Schoeller*, 497 S.W.2d 860 (Mo.App.1973); *Rosen Trust v. Rosen*, 53 A.D.2d 342, 386 N.Y.S.2d 491 (1976); *Nicholes v. Hunt*, 273 Or. 255, 541 P.2d 820 (1975); *Lange v. Bartlett*, 121 Wis.2d 599, 360 N.W.2d 702 (App.1984). Any such entitlement to compensation during the winding up period is tempered by

equitable considerations. *See generally* 1 S. Rowley, *Partnership* § 18(f). Courts have denied compensation to a partner for services in winding up a partnership where the partner acted wrongfully. *See Kennedy v. Kennedy*, 13 Mass.App. 1036, 433 N.E.2d 1247 (1982) (partner took no steps to wind up the partnership when such was his duty); *Bader v. Cox*, 701 S.W.2d 677 (Tex.App.1985) (partner whose fraudulent actions with respect to unfinished partnership business led to purely personal gain was not entitled to compensation).

■ In the initial partnership agreement in this case, Hooper and Yoder agreed to equal salaries. Yoder was subsequently prevented from participating in the corporate decision-making process when Hooper breached his fiduciary duty by excluding Yoder from stock ownership. Hooper proceeded to take a salary from the business without Yoder's consent or knowledge. Under these circumstances, the trial court's decision to deny compensation to Hooper for his services was a proper exercise of its equitable powers.

### III.

■ The trial court adopted a proper remedy for Hooper's breach of his fiduciary duties. When a breach of fiduciary duty has been established, the injured party may recover his share of the partnership profits and property through the imposition of a constructive trust. "[Constructive trusts] are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Page v. Clark*, 197 Colo. 306, 315, 592 P.2d 792, 798 (1979) (quoting *Botkin v. Pyle*, 91 Colo. 221, 14 P.2d 187 (1932)). *Accord Ralston Oil & Gas Co. v. July Corp.*, 719 P.2d 334, 338 (Colo.App.1985). *Cf.* § 7–60–121, 3A C.R.S. (1986) (partner must hold as trustee for partnership any profits derived without consent of other partners from any transaction connected with formation, conduct or liquidation of partnership). Hooper's ac-

tion in acquiring corporate stock and taking a salary without Yoder's consent or knowledge violated Hooper's fiduciary duties to Yoder and can fairly be characterized as fraudulent. The trial court imposed a constructive trust on behalf of Yoder for one-half of the shares of stock issued to Hooper and one-half of the salary received by Yoder as an equitable remedy for Hooper's breach of duty. In doing so, the court properly exercised its equitable powers. *See Page v. Clark*, 197 Colo. at 315, 592 P.2d at 798.

### IV

In summary, Hooper and Yoder agreed to incorporate their business enterprise, which previously had been conducted as a partnership. The essential term of the agreement was that stock ownership would be equal. Upon incorporation the partnership was dissolved. All that remained to be done to terminate the partnership was the distribution of corporate stock in accordance with the parties' agreement. This simple process of winding up the partnership affairs never occurred. Therefore, the fiduciary duties of the parties as partners continued in effect at all times pertinent to this lawsuit. Hooper breached those duties by issuing stock to himself without providing an equal amount to Yoder and by paying salary to himself without Yoder's knowledge or approval. The trial court provided appropriate remedies for these breaches by subjecting the stock and the salary payments to a constructive trust and by requiring Hooper to share the stock and salary equally with Yoder in accordance with the partnership agreement between them.

Judgment affirmed.